11 JOAN BERNARD ARMSTRONG, Judge.
We grant the State’s application for supervisory writs to consider the correctness of a trial court’s ruling granting the defendant Edward Francis’ application for post conviction relief and ordering a new trial. For the following reasons, we affirm the ruling of the trial court.
On May 21,1996, the State filed a bill of information charging the defendant with aggravated burglary, a violation of La. R.S. 14:60. On May 23, 1996, he pleaded not guilty. On June 6, 1996 the trial court found probable cause. On June 24, 1996, the jury found him guilty as charged. On July 10, 1996, the court sentenced the defendant as a triple offender to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. The defendant’s motion to reconsider sentence was denied, and his motion for appeal was granted. On appeal this Court affirmed. State v. Francis, 96-2389 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, writ denied, 98-2360 (La.2/5/99), 737 So.2d 741. The defendant filed an application for post conviction relief alleging, among other claims, that his counsel was ineffective. An evidentiary hearing was conducted on December 18, 2000, and the matter was held open until its completion on April 6, 2001. On August 15, 2001, the trial court signed a written judgment in which the court | ¡¡.concluded that trial counsel was constitutionally ineffective, that counsel’s ineffective assistance violated the defendant’s rights, and that his conviction should be reversed. The State filed the present writ application complaining of the trial court’s ruling.
FACTS
The following facts have been taken from this Court’s opinion in the defendant’s appeal.
On April 23, 1996, at approximately 11:15 p.m., the police were called to investigate a disturbance at 1922 O’Reilly Street. Officers Terrell Seiber and Melvin LaBeaud responded to the call, and saw Karen Wells fleeing from the residence with a baby in her arms. Mr. Francis was exiting the residence behind her. Both officers testified that Ms. Wells was moving so quickly that she stumbled and almost fell. She told Officer Seiber that she first heard a noise and then saw Mr. Francis coming through her front door. He broke a light fixture in the living room, and then came after her in the bedroom. She grabbed for the telephone, but Mr. Francis yanked the phone cord out of the wall. He proceeded to punch her several times in the head.
On direct examination, Ms. Wells corroborated the story she told the police on the night of the incident. She testified that she and Mr. Francis had dated for about four years and that the relationship had ended. She had voluntarily stayed at a shelter for the week prior to this incident because she knew that Mr. Francis had gotten paid and would be getting drunk and looking for her. She did not want Mr. Francis to find her. However, when she returned home from the shelter, she saw Mr. Francis; and they began to argue outside her home. She ran into her neighbor’s house and called her sister. Ms. Wells testified that she did not want to use her own phone, because Mr! Francis might think she was calling the police. She then ran into her own house and locked the door. She stated that Mr. Francis pushed in the front door, breaking the lock. Once *1134 inside, he broke a light fixture in the living room. She ran into the bedroom, and picked up the phone. Mr. Francis pulled the phone cord out the wall. He hit her several times about the head. She then ran out of the front door with her grandchild in her arms and fell.
On cross-examination, Ms. Wells asked if she could tell her story in her own words. She basically repeated what she had stated on direct, but added that when she ran to her own home from the neighbor’s, she knew that Mr. Francis was mad. He pushed the door hopen, and they argued and fought. She knew that Mr. Francis had been drinking, but he was not a violent man.
On re-direct, she affirmed that Mr. Francis had “beat her bad.”
(Footnote omitted).
DISCUSSION
In the defendant’s pro se application for post conviction relief filed below he listed three questions of law relating to: 1) whether a defendant, who actually resided at the residence, could be convicted of aggravated burglary when there was no proof of a theft or burglary therein; 2) whether the bill of information charging the defendant with the crime sufficiently charged aggravated burglary and put the defendant on proper notice; and 3) whether trial counsel was ineffective. The defendant raised the issue of sufficiency of the evidence on appeal. This Court noted the defendant’s arguments: “He argues that there was insufficient evidence of unauthorized entry and no evidence of intent to commit a felony or theft within Ms. Wells’ home. In his pro se brief, Mr. Francis points to an affidavit from Ms. Wells in which she stated that the prosecutor turned everything around, and that she wanted to drop the charges prior to trial.” Id. at p. 3, 715 So.2d at 460. This Court discussed the proof of unauthorized entry:
Mr. Francis first argues that there was insufficient evidence of unauthorized entry in that Ms. Wells indicated that she did not want to press charges. The fact that Ms. Wells decided at some later date that she did not wish to be a witness against Mr. Francis does not negate the physical evidence, i.e., a broken door lock, or her statement to the police the night of the accident, or her testimony at trial. Ms. Wells testified that she locked the door behind her and that Mr. Francis pushed the door in to gain entry. She testified that she did not give Mr. Francis permission to enter her house. There is thus ample evidence that Mr. Francis was not authorized to enter Ms. Wells’ home on the night in question.
| Jd. at pp. 4-5, 715 So.2d at 460. This Court also found sufficient evidence of the defendant’s intent. Id. at p. 5, 715 So.2d at 461.
In his application Sled below the defendant claimed ineffective assistance of counsel as the third issue. The defendant had raised a claim of ineffective assistance of counsel on appeal in a pro se assignment of error. On appeal he argued: that his counsel failed to call witnesses for the defense that counsel was aware of and whose testimony could have influenced the jury’s determination; that counsel never investigated Mr. Francis’ story; that counsel failed to object to the jury charge on aggravated burglary; and, that counsel failed to object during voir dire when one of the jurors stated that she knew the prosecutor. This Court considered the claim of ineffective assistance of counsel as it related to the unobjected-to jury charge and found that it had no merit. This Court held that there was insufficient evidence in the record as to the claim that defense counsel was ineffective for failing to call certain witnesses, failing to investigate, and failing to object during voir dire. *1135 This Court declared that those claims should be asserted in an application for post-conviction relief so that the necessary evidentiary hearing could be held. Id. at 8-10, 715 So.2d at 462-63.
At the evidentiary hearing relating to his application for post conviction relief on December 18, 2000, counsel was appointed to represent Karen Wells, the alleged victim who was told the legal consequences if her testimony at the hearing contradicted her testimony at trial. Ms. Wells testified that she was living with the defendant at 1922 O’Reilly Street on April 23, 1996; they had been there for about a year. However, the owner of the house, her ex-boyfriend, did not know that she was living with a man there. The defendant arrived from work to get something to eat, but Ms. Wells stopped him from entering the residence. Her sister, who was ^inside, was there to smoke crack with Ms. Wells. The defendant knew something was wrong, and he was hollering. The defendant was angry because she was smoking the rocks. He then went back to work with his brother. Ms. Wells remained with her sister smoking crack. The defendant returned after work about five or six o’clock in the evening. He could see that Ms. Wells was “loaded” and the two “started fussing.” They were arguing because he did not want her smoking crack. The argument was very loud, and the people at the barroom across the street made the call to the police. The defendant had a couple of beers and he was angry with Ms. Wells. She claimed that the defendant was not usually violent at all. Ms. Wells said that she was “high” and asked the defendant for money to purchase more cocaine. She threw the hot grease on the stove at the defendant, who then hit her twice (although Glynn Alexander testified that he hit her ten times). She then picked up her baby and started to go outside. The police drove up as she slipped down the step into the defendant, who was trying to help her up. Prior to that she had attempted to call her brother, the two fought over the phone, and they pulled it out of the wall.
Ms. Wells stated that the front door had been broken before that night. The defendant did not break the lock that night. She claimed that she did not tell the officers that the defendant broke down the door. The defendant had a key, but he left it inside during the argument. They both had fallen to the floor over the key. The officers decided to write that the defendant broke the door, and she had no control of what they put in the report. She only told the officers that the defendant hit her. The officers told her that they “were going to get his ass....” The officers put the phone and the door in the report. She denied telling the officers that the defendant broke into her house. The officers never asked whether the defendant | (¡lived there or belonged in the house; she never told them that he lived with her. The officers arrested the defendant while he was trying to pick Ms. Wells and the baby up from the ground. The Assistant District Attorney Glynn Alexander went to her house three or four times. She was told that the defendant was being charged with battery.
According to Ms. Wells, she told Mr. Alexander that the defendant did not break into her house. She told Mr. Alexander that she did not want to press charges, and he told her that she had to go to court and testify to what was in the police report or she would go to jail.' During the trial she informed Mr. Alexander that she had been high on cocaine at the time of the incident and was told not to say that on the stand. She never mentioned that fact at the trial, and defense counsel never questioned her about it. Her trial testimony in which she said that the defendant broke into the house was read. Ms. Wells said that the trial was her first time *1136 in court. She meant that at that time she was trying to get into the house and close the door to keep the defendant out. She acknowledged that the defendant did not need her permission to enter the house; he had his own key. She stated that the defendant removed nothing from the residence that night. The only thing broken was the phone, and that cost ten dollars to replace. After the trial she had told Assistant District Attorney Erin Casey about her testimony and what had happened. Ms. Wells said that she tried to call the judge to tell him that she had been forced to testify at trial to a certain story, but was not allowed to talk to him. She executed an affidavit in which she stated what had happened and why she testified at trial according to the facts in the police report.
On cross-examination Ms. Wells admitted that at the time of the incident she was trying to get inside the house (where the defendant had left his keys) and 17closed the door to keep the defendant out because she was high, and they were fighting. She explained that she re-located to a shelter about a week before the incident because of the owner, not the defendant. She said that she threw either hot water or grease at the defendant; she was not sure, but the affidavit indicated that it was hot water. The trial testimony indicated that Ms. Wells had said that the defendant hit her ten times, but now claimed that she was hit only twice. She claimed that the statement in the report that the defendant forced his way into Ms. Wells’ residence was a lie. The facts in the affidavit reflected the truth.
Rodney Francis, the defendant’s brother, testified that the defendant was living with Ms. Wells at the house on O’Reilly Street in April 1996 although he could not provide the exact number. He had picked up his brother there and brought him home there. He stated that he was not there when the incident occurred. On cross-examination he said that he dropped off the defendant on April 23, 1996, but he was not present when the incident occurred. On redirect examination he stated that he dropped the defendant off at that residence every night.
Yolanda Butler, the defendant’s niece, testified that the defendant was living with Ms. Wells in April 1996. She had dropped her uncle off at the O’Reilly Street address. She had seen him with Ms. Wells there.
The State called Erin Casey Hangartner to the stand. Ms. Hangartner stated that Ms. Wells had talked to her numerous times about her testimony at trial in the defendant’s case. Ms. Wells had said that Mr. Alexander forced her to testify against the defendant, but Ms. Hangartner had explained that the victim’s decision to press charges was not the determining factor. Ms. Hangartner stated that Ms. Wells’ testimony at the hearing was mostly the same as what she had told Ms. | sHangartner numerous times. Ms. Wells had said that the defendant lived with her, that she had tried to keep him out that night because they were fussing, that they went outside and then fell through the door. When she was asked if Ms. Wells ever told her that the defendant took anything or committed any crime inside the house, Ms. Hangartner responded negatively. Ms. Hangartner pointed to one difference in what Ms. Wells had said before; Ms. Wells told her that the owner of the house was incarcerated and did not know that she was living in his house with another man, the defendant. According to Ms. Hangartner, Ms. Wells first approached her some time after the defendant’s trial.
On cross-examination Ms. Hangartner stated that Ms. Wells had said that she had a crack problem, but had obtained *1137 some help. She had found a church, and she “wanted to make things rights (sic).” Ms. Wells continued to say that Mr. Alexander forced her to testify, and she wanted to drop the charges. She never actually said that Mr. Alexander made her lie.
At the hearing on April 6, 2001 Rodney Francis again testified. He reiterated that he knew that the defendant lived with Ms. Wells and dropped him off there on the night of the incident. He said that defense counsel never contacted him prior to the trial, but he received a subpoena. He went to the court on the day of trial and was ready to testify, but he was never called to the stand.
Yolanda Butler again testified that she knew that the defendant lived with Ms. Wells and had been there several times. She said that her uncle’s counsel never contacted her. She also received a subpoena and went to court. However, she was not called to testify.
Glynn Alexander, the prosecutor, testified that he spoke to Ms. Wells for the first time before the motions hearing. He and his investigator drove her to court. |gHe stated that Ms. Wells said that she was living common law with Mr. Tyrone Alonzo, who was working offshore (seven days on and then seven days off); however, she was having an affair with the defendant. According to Mr. Alexander, she never said that the defendant was residing with her. When Mr. Alexander was asked if Ms. Wells told him that the defendant had permission to enter the residence, he answered that she said that the defendant forced his way into the house. There was a physical confrontation, and the defendant struck her several times. Ms. Wells said that she ran out of the house with her baby, and the defendant followed her. The police officers were present when the defendant exited the house. Mr. Alexander said that Ms. Wells did not say that she did not want to testify at the motions hearing. He did not recall that at trial Ms. Wells said that she did not want to testify; in fact she said that the defendant’s relatives were there “staring her down” and she would testify. He denied coercing or threatening Ms. Wells into testifying. Mr. Alexander denied issuing subpoenas for Rodney Francis or Yolanda Butler. He said that Ms. Wells testified at the motions hearing with no problem. However, at trial she hesitated to testify.
On cross-examination Mr. Alexander said that he spoke to Ms. Wells on two occasions. After being confronted with Ms. Wells’ trial testimony where she said that she told the prosecutor that she did not want to testify or press charges, Mr. Alexander conceded that Ms. Wells told him that she did not want to testify, and the prosecutor told her that she would be subpoenaed. Mr. Alexander declared that Ms. Wells never told him that she was on crack the night of the incident. He claimed that she never told him that the defendant lived with her in the house when Mr. Alonzo was not there. Mr. Alexander did not recall asking Ms. Wells if the defendant had his own set of keys to the house.
|inOn redirect exam Mr. Alexander said that Ms. Wells never indicated that the defendant had permission to enter the house. Pursuant to the trial court’s questions, he said that Mr. Alonzo was never at the house when he went to see Ms. Wells. When asked whether the apartment belonged to Mr. Alonzo or Ms. Wells, Mr. Alexander stated that he never inquired and discovered the name on the lease.
In the defendant’s post hearing memorandum he argued that his counsel did not investigate his case even though he faced life imprisonment. Counsel met with him only at arraignment, the motions hearing, and at trial. Counsel never saw the defendant in jail, and he had to file his own list *1138 of witnesses. Even though witnesses were subpoenaed and in court, defense counsel never spoke to the witnesses (Yolanda Butler and Rodney Francis), who could have testified that the defendant was living in the house he allegedly burglarized. Defense counsel also did not cross-examine Ms. Wells about her living arrangements with the defendant. The defendant secondly argued that he was innocent of aggravated burglary if he lived at the residence. Thirdly, the defendant argued that Ms. Wells informed the State that she was using crack cocaine on the night of the incident, but the State withheld that exculpatory evidence from the defense.
On August 15, 2001 the trial court signed its judgment finding merit in the defendant’s ineffective assistance of counsel claim. The trial court noted that the testimony of Yolanda Butler and Rodney Francis at the evidentiary hearing was persuasive. They both knew that the defendant lived at the house with Ms. Wells in 1996. In fact, Rodney Francis picked up and dropped off his brother at that address numerous times, including the night of the incident. The court noted that it learned during the hearing that two witnesses were subpoenaed to trial only because the defendant filed a pro se witness list. However, defense counsel never In called them to the stand. The court stated that Ms. Wells testified at the hearing that material portions of her trial testimony were false. She said that she lied when she testified that the defendant’s entry into the house was unauthorized; he had his own set of keys and was living with her at the time. The court noted that defense counsel never cross-examined Ms. Wells as to her relationship with the defendant or her living arrangements. The court also noted former Assistant District Attorney Erin Casey Hangartner’s testimony that, on numerous occasions after the defendant’s trial, Ms. Wells had said that her trial testimony was false and the defendant had been living with her at the time of the incident.
The trial court concluded that “trial counsel utterly failed to make an independent investigation of his client’s case and to interview potential witnesses.” The court stated that the failure to call the witnesses could not be considered to be strategy. The witnesses’ testimony would have refuted one of the essential elements of the crime of aggravated burglary, unauthorized entry. The court concluded that the performance of the defendant’s counsel “was deficient, and his dereliction prejudiced his client by leading to an unreliable jury verdict.” The court went on to say: “Had the witnesses discussed above testified at his trial, a reasonable probability exists that petitioner’s jury would have had a reasonable doubt about his guilt.” The court found that the ineffective assistance of defense counsel violated the defendant’s Sixth and Fourteenth Amendment rights and reversed the defendant’s conviction. The court did not consider the other claims.
In State v. Miller, 2000-0218, pp. 6-7 (La.App. 4 Cir. 7/25/01), 792 So.2d 104, 111, this Court discussed the two-part test relating to an ineffective assistance of counsel claim:
|1?A defendant’s claim of ineffective assistance of counsel is to be assessed by the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). The defendant must show that counsel’s performance was deficient and that the deficiency prejudiced the defendant. Counsel’s performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed to the defendant by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at *1139 2064. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir.1992).
If an error falls within the ambit of trial strategy, it does not establish ineffective assistance of counsel. State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir.1986). Hindsight is not the proper perspective for judging the competence of counsel’s decisions because opinions may differ as to the advisability of a tactic. An attorney’s level of representation may not be determined by whether a particular strategy is successful. State v. Marino, 2000-1131 (La.App. 4 Cir. 6/27/01), 804 So.2d 47, citing State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
The U.S. Fifth Circuit has discussed the claim of inadequate investigation relating to an ineffective assistance of counsel claim:
We have previously recognized that adequate investigation is a requisite of effective assistance. See Rummel v. Estelle, 590 F.2d 103, 104 (5th Cir.1979) (per curiam); Gaines v. Hopper, 575 F.2d 1147 (5th Cir.1978) (per curiam). To establish a constitutional violation, a defendant must show both a failure to investigate adequately and prejudice arising from that failure. See Washington v. Watkins, 655 F.2d 1346, 1362 & n. 32 (5th Cir.1981). The determination of whether a defendant has been prejudiced varies of course with each breach alleged. When, as in this case, a defendant 113alleges that his counsel’s failure to investigate prevented his counsel from making an informed tactical choice, he must show that knowledge of the uninvestigated evidence would have altered his counsel’s decision. The fact that an investigation would have turned up admissible evidence is in itself insufficient to show prejudice. Cf. Washington v. Strickland, 673 F.2d 879 (5th Cir.1982). A defendant must demonstrate that the bases underlying his counsel’s tactical choice to pursue or forego a particular course would have been invalidated.
Gray v. Lucas, 677 F.2d 1086, 1093 (5th Cir.1982). More recently the U.S. Fifth Circuit again discussed a failure to investigate claim:
Our review of counsel’s performance is “highly deferential,” and we “indulge a strong presumption that counsel’s performance falls within the wide range of reasonable professional assistance.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Recognizing that in “failure to investigate” cases the temptation to rely on hindsight is strong, the Supreme Court stated that “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.” Id. at 690, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. However, “strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular *1140 investigations unnecessary.” Id. at 690-91, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Strickland does not require us to defer to decisions that are uninformed by an adequate investigation into the controlling facts and law. See Moore v. Johnson, 194 F.3d 586, 615 (5th Cir.1999).
United States v. Drones, 218 F.3d 496, 500 (5th Cir.2000).
In its writ application the State argues that trial counsel’s decision not to call Yolanda Butler and Rodney Francis was trial strategy. The defendant in his response counters that argument by noting that defense counsel never spoke to the witnesses or investigated the ease in order to determine the possible effect of the witnesses’ testimony on the jury. The trial judge, who heard the testimony at the defendant’s trial and the evidentiary hearing, concluded that counsel’s failure to call the witnesses could not be considered tactical. The court supported its decision quoting Drones and stating that strategy could not be imputed to tactics | ^uninformed by adequate investigation. The court reasoned that the testimony of the two witnesses, who had not been contacted by counsel, would have controverted one of the essential elements of aggravated burglary, the unauthorized entry. Thus, it appears that the court properly utilized the Strickland test, reversed the defendant’s conviction, and ordered a new trial.
Accordingly, we grant the application for supervisory writs, and affirm the ruling of the trial court.

WRITS GRANTED; AFFIRMED.