859 So.2d 785 (2003)
STATE of Louisiana
v.
Christoper D. LEBRETON.
No. 2003-KA-0321.
Court of Appeal of Louisiana, Fourth Circuit.
October 8, 2003.
*788 Eddie J. Jordan, Jr., District Attorney, Claire Adriana White, Assistant District Attorney, Orleans, LA, for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge MAX N. TOBIAS JR., and Judge LEON A. CANNIZZARO JR.).
WILLIAM H. BYRNES, III, Chief Judge.
Christopher D. Lebreton appeals his convictions and sentences for various counts of aggravated rape, aggravated kidnapping, and aggravated crime against nature. We affirm.

*789 Procedural History

On January 4, 2001, the State indicted Christopher Lebreton with three counts of aggravated rape, La. R.S. 14:42 (counts 1,3 and 7), three counts of aggravated kidnapping, La. R.S. 14:44 (counts 2, 4 and 8), and two counts of aggravated crime against nature, La. R.S. 14:89.1 (counts 5 and 6). On January 10, 2001, Lebreton appeared for arraignment, and the trial court read the indictment and set a hearing to determine counsel. On January 25, 2001, the trial count appointed counsel to represent Lebreton, and set a hearing on motions. On February 1, 2001, the trial court conducted a lunacy hearing and ordered additional psychiatric evaluation of Lebreton at the Feliciana Forensic Facility. In addition, the trial court granted the State's motion for DNA/blood testing.
On December 6, 2001, the trial court found Lebreton competent to proceed, and the State re-urged its motion for DNA/ blood testing, which the court granted. On January 11, 2002, the trial court denied the defense motions to suppress the evidence and identification. On May 17, 2002, the trial court denied the defense motion to sever the offenses, but allowed Lebreton to change his plea from not guilty to not guilty and not guilty by reason of insanity.
After a bench trial on September 10-13, 2002, the trial judge found Lebreton guilty as charged on all counts. On September 20, 2002, the trial court denied Lebreton's motions for new trial, post-verdict judgment of acquittal, to reconsider sentence and arrest of judgment, but granted his motion for appeal. That same day, the court sentenced Lebreton to six life sentences for the aggravated rape and aggravated kidnapping convictions (counts 1, 2, 3, 4, 7 and 8) and to fifteen-year sentences on each of the aggravated crime against nature convictions (counts 5 and 6). The trial court ordered that the sentences be served concurrently.

Facts

Kidnap and Rape of A.G.[1]
At approximately 9:00 p.m. on September 24, 2000, A.G. exited the Magazine Street bus at First Street. As A.G. walked toward her home on Chippewa Street, she noticed a man walking on the left side of the street, in the opposite direction. Uneasy about her safety, A.G. turned around to monitor the man's actions. When A.G. turned around, the man was standing behind her with a handkerchief pulled up to his nose, and a gun pointed at her. He pushed A.G. into an alley, and ordered her to disrobe. She offered him her jewelry, but he refused it, threatening to kill or stab her if she resisted his advances. A.G. removed her clothes. The man pushed her down, causing her to break some of her acrylic nails. The man vaginally raped A.G. During the rape, the attacker's bandana slipped down, allowing A.G. to see his face. After the attack, the rapist told A.G. not to look as he fled the alley. As soon as A.G. was certain her attacker was gone, she put on her blouse and pants, and ran home, leaving her undergarments and slippers in the alley. Her boyfriend called the police.
New Orleans Police Officer Byron Mitchell interviewed A.G. at her home. She described the assailant as a young, light-skinned black male with bushy hair and sideburns, 23 to 25 years old, wearing a white T-shirt, gray shorts and black and white tennis shoes. A.G. accompanied Officer Mitchell to the rape site, where Sergeant Toni Blanco met them. A.G. recounted her ordeal to the officers, and they *790 transported her to the Medical Center of Louisiana for testing.
Peggy Fitzmorris, a certified sexual assault nurse, performed the sexual assault examination on A.G. about 1:30 a.m. on September 25, 2000. A.G. gave Ms. Fitzmorris an oral account of the rape, and Ms. Fitzmorris collected fingernail scrapings, head and pubic hairs, saliva and blood samples plus a vaginal swab from A.G. Ms. Fitzmorris noted that A.G. was in shock, and had broken at least one of her acrylic nails. Ms. Fitzmorris bagged A.G.'s clothes, and turned them over to the police, along with the evidence collected during the rape exam.
Sergeant Toni Blanco, a member of the sex crimes unit, met A.G. and Officer Byron Mitchell at the rape scene, where she directed investigators in photographing and collecting evidence, including A.G.'s underwear, slippers and broken acrylic nails. Approximately one month later, with the help of a police sketch artist, A.G. formulated a composite of her assailant. Sergeant Blanco's investigation and ensuing events developed the defendant as a suspect. On October 26, 2000, A.G. viewed a photographic lineup compiled by Sergeant Blanco, and immediately identified the defendant as her attacker. Pursuant to A.G.'s identification, Sergeant Blanco obtained an arrest warrant for the defendant and a warrant to search his residence, which yielded seven .380 caliber bullets, one pair of black tennis shoes and one pair of white shorts with the words "Skyy Vodka" printed on them.

Kidnap and Rape of N. J.
On October 15, 2000, at approximately 9:30 p.m., a short, light-skinned black man with bushy hair kidnapped N.J. and her two-year old son as they walked on LaSalle Street. The man held a knife to her neck, and warned her not to scream. Although the man pulled her scarf over her eyes, N.J. could see through the scarf. The assailant forced N.J. and her son into a black Nissan Sentra. The assailant drove N.J. and her child around for a short time, and eventually parked the vehicle. He told N.J. to place the child on the floor in the front of the car, and then get into the back seat. He ordered her to disrobe, and vaginally raped her. Next, he told N.J. to turn around so that he could sodomize her. When she refused, he threatened to sodomize her child. When N.J. pleaded with the assailant not to harm the child, he hit her, and then made her place his penis in her mouth. The assailant then got back in the front seat of the car, and drove N.J. and her child down Tchoupitoulas Street to Audubon Park. He pulled N.J. out of the vehicle toward some trees, where he vaginally raped her, as her child stood next to her. While the assailant fondled himself, he made N.J. perform fellatio on her son. Before leaving the scene, the assailant urinated on N.J., and took her driver's license.
N.J. began to scream, and attracted the attention of Tedd Mosses,[2] a neighborhood resident, who aided the victim, and called the police.
N.J. reported the facts of the assault to the police. She told them that her attacker wore shorts with the word "vodka" printed on them. Approximately two weeks later, N.J. positively identified the defendant from a photographic lineup compiled by Sergeant Blanco as her attacker.
At about 11:32 p.m. on the night of the rape, Detective Allen Gressett interviewed the physically disheveled and emotionally overwrought victim in his office. N.J. gave Detective Gressett a statement, describing her attacker and his four-door *791 black Nissan Sentra. N.J. led Detective Gressett to three locations, retracing the steps of her ordeal that night.
On October 26, 2000, Detective Gressett learned the police arrested a suspect in a rape that night, and that the suspect fit the description of N.J.'s attacker. Detective Gressett and Officer Byron Mathews relocated to that scene. Upon his arrival, Detective Gressett learned that the suspect asked officers to secure his girlfriend's vehicle, a four-door, black Nissan Sentra. Detective Gressett recognized the vehicle description from N.J.'s rape, and had the car impounded, pending issuance of a search warrant. When officers processed the vehicle, they found pants containing the defendant's identification, and a small amount of marijuana on the front seat.
Anne Troy, certified sexual assault nurse, examined N.J. at the Medical Center of Louisiana. The victim related to Ms. Troy the details of the attack that night. Ms. Troy completed a rape examination kit by taking head and pubic hair combings from the victim. She also took blood and saliva samples, fingernail scrapings and oral and vaginal swabs. Ms. Troy sealed the evidence in the kit and gave the kit to a NOPD officer.

Kidnap and Rape of A. J.
Shortly after midnight on October 25, 2000, Elaine Lloyd observed her fourteen-year-old neighbor, A.J., walking to her home. Ms. Lloyd noticed a black male following A.J. The man grabbed A.J. from behind, and pushed her into some bushes in a vacant lot. Ms. Lloyd rode her bicycle to a convenience store four blocks away, and reported the incident to police officers.
The man held a knife to A.J.'s throat as he gagged her, and forced her to the rear of a vacant lot. The man threatened to kill A.J. if she did not take her clothes off. He made her kneel down, and vaginally raped her. When a car passed, the defendant forced her to lie down. He vaginally raped her again.
Officers Melvin Williams and Bryant Louis relocated to the 2400 block of South Liberty Street in response to Ms. Lloyd's information. As Officer Williams exited the police car, he heard crying and moaning sounds coming from a vacant lot. Officer Williams focused his flashlight in the direction of the sounds, and saw the suspect standing behind A.J., who was lying in a fetal position on the ground. Both the victim and the suspect were nude from the waist down. Officer Louis sprayed the suspect with mace to subdue him. The officers secured the suspect in the police unit, and seized a box cutter from him in the process. Officer Williams could not coax the hysterical A.J. from the lot, so he covered her with a raincoat, and called for medical assistance. When the EMS personnel arrived, they assisted A.J. from the lot, and transported her to the Medical Center of Louisiana for treatment.
Officers Desmond Pratt and Simone Lewis arrived on the scene as backup. They assisted in securing the suspect in the Williams-Louis police unit. The suspect asked Officer Pratt to secure his girlfriend's vehicle, a black Nissan Sentra, which was parked around the corner.
Officer Shiryl Mathews of the sex crimes unit accompanied Detective Gressett to investigate the rape. Officer Mathews briefly spoke to A.J. at the scene, and although she was in shock, A.J. identified the defendant as her attacker. Officer Mathews observed clothing, a woman's purse, jewelry, a cell phone and a utility knife at the site of the rape. Mathews' inspection of the black Nissan Sentra revealed the key in the ignition and a pair of cut-off jean shorts on the front seat.
*792 Ms. Julie Golden, an expert in molecular biology and forensic DNA analysis, received and performed DNA typing on blood samples from the defendant, N.J. and A.G. She also tested vaginal swabs taken from N.J. and A.G. Ms. Golden stated that the test results positively identified the defendant as the man who raped N.J. and A.G. Ms. Golden also testified that she received A.J.'s underwear for testing; however, the amount of seminal fluid found on the victim's underwear was too small to produce scientifically reliable test results.
The defendant testified that he had no memory of any of the crimes in question. He further stated that he did not know any of the victims.
Mark Zimmermann, Ph.D.,[3] testified on behalf of the defendant. Dr. Zimmermann examined the defendant on March 22, 2002. He stated that he reviewed a psychiatric evaluation of the defendant rendered by physicians at the Feliciana Forensic Facility in October 2001, and that he did not agree with the Facility's physicians' conclusion that the defendant was feigning mental illness. In Dr. Zimmermann's opinion, the defendant exhibited signs of psychosis, which would be consistent with the defendant's inability to remember any of the crimes with which he was charged.
The State called Dr. Richard Richoux on rebuttal. The defense and the State stipulated that Dr. Richoux was an expert in forensic psychiatry. Dr. Richoux testified that he was part of the lunacy commission charged with determining the defendant's competency. He met with the defendant in February 2001, but was unable to perform a routine examination of the defendant because the defendant refused to cooperate. As a result, Dr. Richoux recommended that the defendant be found incompetent to proceed and that he be committed for further evaluation and treatment to Feliciana Forensic Facility, where he remained until October 2001, when the Facility found him competent to proceed.
Dr. Richoux evaluated the defendant in December 2001 and found him to be asymptomatic for any diagnosable mental disorder, other than a history of chemical dependency. However, Dr. Richoux opined that chemical dependency would not deprive a person of the ability to tell right from wrong. Dr. Richoux further testified that he reviewed the police reports of the crimes, and found the defendant's behavior "goal-oriented". Considering the absence of brain damage, which might account for the defendant's periods of "memory loss", and no proof of toxic psychosis, coupled with the defendant's "goal-oriented" behavior, Dr. Richoux saw "absolutely no indication that [the defendant] was unable to distinguish right from wrong [at the time of the crimes]."

Errors Patent
A review for errors patent on the face of the record reveals that the trial judge failed to adhere to the time constraints of La. C.Cr.P. art. 873. Failure of the trial court to observe the mandatory twenty-four hour delay after denial of a motion for new trial, where such delay is not waived, requires the sentence to be vacated and the case remanded for resentencing. State v. Augustine, 555 So.2d 1331, 1333 (La.1990), superseded, in part, by statute as stated in State v. Martin, 93-1915, pp. 2-3 (La.App. 4 Cir. 9/29/94), 643 So.2d 830, 832;[4]State v. Brauner, 99-1954, *793 p. 14 (La.App. 4 Cir. 2/21/01), 782 So.2d 52, 63, writ denied XXXX-XXXX (La.3/22/02), 811 So.2d 920.
However, Louisiana jurisprudence has recognized exceptions to this requirement in cases where the failure to observe the delay is considered harmless. For instance, State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, certiorari denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), held that the failure of the trial court to observe the mandatory twenty-four hour rule was harmless where the sentence imposed was mandatory in nature. Id. at p. 17, 684 So.2d at 380. Further, failure to observe the twenty-four hour period has been considered harmless where there is a sufficient delay between the date of conviction and the date of sentencing; there is no indication that the sentence is hurriedly imposed; and there is no argument or showing of actual prejudice by the failure to observe the twentyfour hour delay. State v. Sam, 99-0300, p. 8 (La.App. 4 Cir. 4/19/00), 761 So.2d 72, 78, writ denied XXXX-XXXX (La.9/14/01), 796 So.2d 672 (delay between conviction and sentencing less than one month); State v. Dickerson, 579 So.2d 472, 484 (La.App. 3 Cir.1991), writ granted in part, 584 So.2d 1140 (La.1991) (delay between conviction and sentencing exceeded one month). But cf., State v. Brauner, supra, 99-1954 at p. 14, 782 So.2d at 63 (required sentence be vacated even though more than six months elapsed between conviction and sentencing).
In the present case, prior to sentencing, the defendant filed motions for new trial, post verdict judgment of acquittal, arrest of judgment and to reconsider sentence. The defendant was sentenced on the same day that those motions were denied. There is no indication that the defendant waived the twenty-four hour delay, either expressly or implicitly. However, the defendant in this case was convicted of three counts of aggravated kidnapping and three counts of aggravated rape, crimes that carry mandatory life sentences. Therefore, pursuant to State v. Seals, supra, the failure to observe the twenty-four hour delay is harmless. In addition, for the defendant's two aggravated crime against nature convictions, the court sentenced him to the maximum sentence of fifteen years on each count. Likewise, the trial court's failure to observe the statutory delay before sentencing the defendant for those crimes is harmless because there was a sufficient delay between the date of conviction and the date of sentencing (seven days), the defendant has not shown that the sentence was hurriedly imposed, and there is no argument or showing of actual prejudice by the failure to observe the twenty-four hour delay. State v. Sam, supra. There are no other errors patent.
On appeal the defendant contends that: (1) the trial court erred in denying his motion to sever the counts; (2) the evidence was insufficient because the defendant was insane at the time of the offense; (3) his sentences were excessive; [ and (4) the trial court erred in granting the State's motion to obtain blood samples while the defendant was found incompetent to proceed.

Motion to Sever
Initially, the defendant contends the trial court erred in denying his motion to sever the counts.
La.C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in *794 a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
In State v. Porche, 2001-2086 p. 7 (La.App. 4 Cir. 5/22/02), 819 So.2d 1122, 1127, this Court discussed the possibility of a defendant being prejudiced by the joinder of offenses:
Generally, "there is no prejudice and severance is not required if the facts of each offense are not complex, and there is little likelihood that the jury will be confused by the evidence of more than one crime." State v. Carter, 99-2234 (La.App. 4 Cir. 1/24/01), 779 So.2d 125, 145, citing State v. Lewis, 557 So.2d 980, 984 (La.App. 4 Cir.1990). The defendant has a heavy burden of proof when alleging prejudicial joinder of offenses, and he must make a clear showing of prejudice. Id. In determining whether joinder of two or more offenses would result in prejudice, a court should consider: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Coston, XXXX-XXXX p. 9 (La.App. 4 Cir.9/5/01), 800 So.2d 907, 914.
Whether a motion to sever should be granted rests within the sound discretion of the trial court whose decision will not be disturbed on appeal absent a showing of abuse of that discretion. State v. Coston, XXXX-XXXX (La.App. 4 Cir. 9/5/01), 800 So.2d 907, writ denied 2001-2819 (La.10/4/02), 826 So.2d 1115. The defendant has a heavy burden of proof when alleging prejudicial joinder of offenses, and he must make a clear showing of prejudice. Id.
In the present case, the defendant argues that considering that one of the offenses involved fellatio performed on a two-year-old and that in another the police caught the assailant in the act, the joinder of those offenses prejudiced him so that he did not receive a fair trial as to the other counts.
The defendant failed to clearly show prejudice in this case. The defendant was charged and tried on three counts of aggravated kidnapping, three counts of aggravated rape and two counts of aggravated crime against nature. Although the charges arose from separate incidents, in different locations, they occurred within one month of each other and are triable by the same mode of trial. The facts of the offenses are similar, simple and uncomplicated. All of the victims were threatened with a weapon. The defendant ordered each victim to disrobe and then raped her. The victims each identified the defendant through a photographic lineup, and testified clearly as to the facts of each incident. The investigating officers documented and distinguished each offense. DNA testing positively identified the defendant as the rapist in two of the offenses, and the third victim identified the defendant as her attacker on the scene.
The defendant offered no evidence that the State's presentation of all the crimes together confused the trial judge or hindered the defendant's right to present a defense. Further, the defendant presented *795 no evidence to suggest that the State joined the offenses to show the defendant's criminal propensity, and there is no evidence of judicial hostility as a result of the joinder. The trial court did not abuse its discretion by denying the defendant's motion to sever.

Claim of Insufficient Evidence Based on Insanity Defense
The defendant claims that the evidence is insufficient to support his convictions because he proved he was insane at the time of the offenses.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. State v. Mussall, 523 So.2d 1305 (La.1988). A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319 (La.1992).
In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La. R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, the defendant must show that he suffered a mental disease or mental defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Williams, 346 So.2d 181 (La.1977).
"The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proved by a preponderance of the evidence that he was insane at the time of the offense." State v. Currie, 2000-2284, p. 28 (La.App. 4 Cir. 2/13/02), 812 So.2d 128, 137, writ denied XXXX-XXXX (La.11/15/02), 829 So.2d 421. Lay testimony pertaining to the defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94), 643 So.2d 1222.
In the present case, psychologist, Dr. Marc Zimmermann, testified for the defense. Dr. Zimmermann stated that he interviewed the defendant three times prior to trial, and concluded that the defendant suffered from schizophrenia, paranoid type, probably substance dependent. The doctor reviewed the findings of the lunacy commission, as well as the commission's recommendation that the defendant be sent to Feliciana Forensic Facility for observation for suspected malingering or feigning insanity. The doctor reviewed the report/analysis rendered by the Feliciana Forensic Facility, and deemed its conclusions confusing and/or contradictory. Specifically, Dr. Zimmermann took issue with a section of the report which stated: "The profile of scores shown above indicated the likelihood of honest responding was low. While the likelihood of feigning/exaggerating psychological complaints was likely, this profile of scores fall[s] below *796 typical level of those feigning mental disorders." Dr. Zimmermann testified that the preceding statement directly contradicted the report's diagnosis of "malingering also diagnosed as cocaine and marijuana abuse."
Under cross-examination, Dr. Zimmermann admitted that he could not render an opinion as to the defendant's mental status at the time of the offenses.
In rebuttal, psychiatrist Dr. Richard Richoux, the State's expert, testified that he examined the defendant in February 2001, as a member of the lunacy commission. However, the defendant frustrated the commission's work by his refusal to cooperate in a routine evaluation. The defendant's lack of cooperation led to his confinement for observation at the Feliciana Forensic Facility. Dr. Richoux next examined the defendant in December 2001, and found no diagnosable mental disorder, other than a history of chemical dependency. Dr. Richoux noted that Dr. Zimmermann focused on only one small section of the report rather than all the criteria considered in formulating the diagnosis of the defendant as malingering or feigning insanity. Dr. Richoux noted that the report also stated that "[the defendant's] score on a well known measure of feigning of psychotic symptoms, on the other hand, was indicative of feigned/exaggerated psychotic symptoms ..." and that "the seriousness of his pending charges and the strength of the evidence against him would prove sufficient motivation for the feigning/exaggeration of mental illness."
Based upon his examinations of the defendant in conjunction with the report rendered by the Feliciana Forensic Facility and the police report, Dr. Richoux concluded that the defendant did not suffer from any type of mental disease or defect. In particular, Dr. Richoux found:
... one must look, if entertaining the possibility of any kind of toxic psychosis, at what is described as the individual's behavior, demeanor, statements made during those periods of time. As I appreciate it, what's described in these police reports is totally inconsistent with the behavior or verbiage of someone who, because of a toxic psychosis is unable to distinguish right from wrong, unable to appreciate reality or separate reality from non-reality. What's contained in the police reports is organized, purposeful behavior of an individual whose verbalizations include direct threats of physical harm made in appropriate context to the victims. It involves evasive behavior on [the defendant's] part, intimidating behavior on his part. And all of these things are done in a very organized fashion as described in the police reports. The fact that someone who presumably is under a toxic influence could behave in that fashion one time is very unlikely. The fact that someone who is behaving under a toxic influence could do that two times is even more unlikely. The fact that an individual who is suffering from toxic psychosis could engage in that kind of organized behavior three times over a period of several weeks is extremely unlikely. And so taking all the data that's available to me into account, I see absolutely no indication that [the defendant] was unable to distinguish right from wrong at any of those times in question.
Pursuant to State v. Currie, supra, all of the evidence, including expert and lay testimony, along with the defendant's conduct and action in the present case, indicate that the defendant knew right from wrong, and was sane at the time of the offenses. The trial court did not err in finding that the defense did not prove by a preponderance of the evidence that the defendant was insane at the time of the offense because *797 a mental defect prevented him from distinguishing between right and wrong with reference to the conduct involved.

Claim of Excessive Sentences
The defendant also complains that his six life sentences are unconstitutionally excessive.
La. Const. art. I, § 20 explicitly prohibits excessive sentences. State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, 977. "Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment." State v. Francis, 96-2389, p. 6 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461 (citing State v. Sepulvado, 367 So.2d 762 (La.1979)), grant of post-conviction relief affirmed, XXXX-XXXX (La.App. 4 Cir. 2/6/02), 809 So.2d 1132. However, "[t]he penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society." Baxley, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987), writ denied 516 So.2d 366 (La.1988). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 676. "A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice." Baxley, supra, 656 So.2d at 979, quoting State v. Lobato, 603 So.2d 739 (La.1992); State v. Washington, XXXX-XXXX (La.App. 4 Cir. 7/18/01), 793 So.2d 376.
"In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record." State v. Harris, XXXX-XXXX, p. 12 (La.App. 4 Cir. 4/18/01), 787 So.2d 420, 429, writ denied XXXX-XXXX (La.4/26/02), 813 So.2d 1101, citing State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. "If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." State v. Robichaux, XXXX-XXXX, p.10 (La.App. 4 Cir. 3/14/01), 788 So.2d 458, 466, writ denied XXXX-XXXX (La.3/15/02), 811 So.2d 897. In State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819, writ denied, 98-2171 (La.1/15/99), 735 So.2d 647, and certiorari denied 537 U.S. 839, 123 S.Ct. 157, 154 L.Ed.2d 60 (2002), this court stated:
... The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D)....
In State v. Soraparu, 97-1027, p. 1 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
... On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence *798 might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982)....
In the present case, the defendant was convicted of three counts each of aggravated kidnapping and aggravated rape. Those two offenses carry mandatory sentences of life imprisonment without the benefit of parole, probation or suspension of sentence. La. R.S. 14:44 and 14:42.
In rendering the verdict in this case, the trial judge addressed the defendant and stated:
... I have never had the opportunity to participate in a trial where I've been emotionally charged the way I was in this particular trial. The crime is heinous enough, but some of the things that you committed upon these women and upon that child are things that will stay in my mind forever. They were despicable, and I want you to know that. I have looked at these charges. I have looked at the responsive verdicts. I have tried desperately to find anything other than these charges. But the evidence that was presented by the State left me no conclusion but to find you guilty as charged of all of these counts. I wish there was any other way. I wish there was a way we could turn back the clock. I wish there was a way we could bring these [women] in and they could forget about the whole incident like you have. [Your] memory is certainly convenient. They have to live with these memories the rest of their lives. I'm not throwing the book at you. This is what you are charged with. And this is my mind, beyond a reasonable doubt, is what you are guilty of.... I'm just so disgusted, hurt, angered by this, and I've tried to make my emotions stay out of it. And that's why I went back and tried to find what the lesser included offenses were and what the other charges could be. And no matter how hard I tried, I kept hitting a brick wall because the State has proven this case well beyond a reasonable doubt ...
Other Louisiana courts have affirmed life sentences for aggravated rape and aggravated kidnapping. See State v. Howard, 31,807 (La.App. 2 Cir. 8/18/99), 746 So.2d 49; State v. Hawkins, 99-217 (La. App. 5 Cir. 7/2/99), 740 So.2d 768, 770; State v. Dunbar, 94-1492 (La.App. 3 Cir. 5/31/95), 657 So.2d 429; and State v. Spitz, 93-2070 (La.App. 1 Cir. 12/22/94), 650 So.2d 271, writ denied 95-0742 (La. 9/1/95), 658 So.2d 1269.
The defendant in the present case contends that his life sentences are excessive because the trial judge failed to consider his family background, education or employment.
Considering the trial judge's well-articulated reasons for sentencing, the defendant's *799 criminal history and the heinous and cruel nature of his crimes, his sentences are not grossly out of proportion to the seriousness of the crime, nor are they needless and purposeless infliction of pain and suffering. The defendant is the "most egregious violator" of the law the legislature had in mind when it determined the penalties for the offenses he committed. The record reflects that the trial court adequately complied with La.C.Cr.P. art. 894.1 in particularizing the sentence to the defendant. The sentence does not shock the sense of justice.
In fact, the sentences were made to run concurrent. Because the criminal activity involved three separate and distinct episodes, there is a basis in fact and in law for imposing each set of sentences consecutive to each other. See La.C.Cr.P. art. 883. The defendant received a somewhat lenient sentence in that, for all of his criminal activity, he only received one life sentence.

Motion to Obtain Blood Samples
Finally, the defendant argues that the trial court erred in granting the State's motion to obtain blood samples from the defendant during the period of time that he was incompetent to proceed, in violation of La.C.Cr.P. art. 642.[5]
The defendant was declared incompetent to stand trial on February 1, 2001. That same day the State filed, and the trial court granted, a motion to obtain blood samples from the defendant for DNA testing. However, the State did not obtain a blood sample from the defendant at that time. In fact, the State re-filed its motion on December 6, 2001, following the hearing in which the trial judge declared the defendant competent to stand trial. The record reflects the State addressed the issue:
Your honor, prior to Mr. Lebreton's being ruled incompetent, approximately about a year ago, the State was moving to have him produce a blood sample. At this time, the State is noting [its] intention to file a written motion tomorrow morning and ask that this be set for a status hearing for Monday to determine a date in which the doctor can come and pull his blood.
The defendant did not suffer any prejudice, and is not entitled to relief.
Accordingly, the defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] Due to the nature of the crimes, the victims are identified by their initials.
[2] The named is also spelled "Moses" in the record.
[3] The name is also spelled "Zimmerman" in the record.
[4] In State v. Martin, the court noted that Augustine is overruled to the extent that defendant fails to comply with La.C.Cr.P. art. 881.1. Martin, 93-1915 at p. 2, 643 So.2d at 832. Martin states that defendant must file a motion to reconsider sentence within 30 days of the imposition of sentence: failure to do so precludes defendant from challenging his sentence on appeal. Id.
[5] La.C.Cr.P. art. 642 provides in part:

... When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.