876 So.2d 912 (2004)
STATE of Louisiana
v.
Dimarco LEWIS.
No. 2003-KA-1234.
Court of Appeal of Louisiana, Fourth Circuit.
June 2, 2004.
*913 Eddie J. Jordan, Jr., District Attorney, Donna R. Andrieu, Assistant District Attorney, New Orleans, LA, for Appellee, State of Louisiana.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant, Dimarco Lewis.
(Court composed of Judge JAMES F. MCKAY, III, Judge DENNIS R. BAGNERIS, SR., Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
The defendant, Dimarco Lewis, was convicted of one count of attempted armed robbery, one count of armed robbery, and two counts of attempted second degree murder. He is now appealing his convictions on the ground that he was denied effective assistance of counsel at his trial, because his attorney failed to move to sever the counts with which Mr. Lewis was charged, and on the ground that the trial court imposed an excessive sentence.

STATEMENT OF THE CASE
Mr. Lewis and Lawrence James[1] were charged with one count of attempted armed robbery and one count of attempted second degree murder in connection with crimes that had been perpetrated against Jonathan Perrow. Mr. Lewis and Mr. James were also charged with one count of armed robbery and a second count of attempted second degree murder in connection with crimes that had been perpetrated against Demetrieus Williams. Both Mr. Lewis and Mr. James originally entered pleas of not guilty.
The attorneys for both Mr. Lewis and Mr. James moved to sever the trials of the two defendants, and the motion was granted. Mr. James was tried first, but the trial ended in a mistrial. The following day Mr. James pled guilty to one count of attempted armed robbery, to one count of armed robbery, to one count of attempted second degree murder, and to one count of being an accessory after the fact to attempted second degree murder.[2] Mr. James was ultimately sentenced to serve ten years at hard labor without the benefit of probation, parole, or suspension of sentence.
A month after Mr. James pled guilty, Mr. Lewis was tried and found guilty on all counts with which he had been charged. Under the Habitual Offender Law, La. R.S. 15:529.1, Mr. Lewis was found to be a second felony offender in connection with his armed robbery conviction. The State also filed a motion to invoke the firearm sentencing provisions of La. R.S. 14:64.3, which provides for the imposition of an additional five-year sentence if a firearm has been used in connection with an armed robbery or an attempted armed robbery.
Mr. Lewis was sentenced to serve forty-nine and one half years at hard labor on the conviction of attempted armed robbery, *914 fifty years at hard labor on the conviction for the attempted second degree murder of Mr. Perrow, one hundred and ninety-eight years at hard labor on the conviction of armed robbery as a second felony offender under La. R.S. 15:529.1, and fifty years at hard labor on the conviction of the attempted second degree murder of Mr. Williams. All sentences were to be served concurrently without the benefit of probation, parole, or suspension of sentence. Additionally, a five-year sentence at hard labor was imposed under the provisions of La. R.S. 14:64.3, because a firearm was used in connection with the crimes of armed robbery and attempted armed robbery. The five-year sentence was to be served consecutively to the one hundred ninety-eight year sentence and was to be served without the benefit of probation, parole, or suspension of sentence. Finally, Mr. Lewis was ordered to pay Mr. Perrow $50,000 in restitution for lost wages.
Mr. Lewis has appealed his convictions. He has urged two specific assignments of error on appeal.

STATEMENT OF THE FACTS
This case involves two separate incidents. Both took place on the same day, however, and they involved similar crimes. In the first incident, the victim of the crimes was Mr. Perrow. In the second incident, Mr. Williams was the victim.

Crimes Against Mr. Perrow
Mr. Perrow was jogging in New Orleans early one morning along his usual jogging route, and as he turned onto Burgundy Street, he saw two young, African American males approaching him on a bicycle. One of the males was pedaling the bicycle, and the other was riding on its handlebars. Mr. Perrow later identified the two males as Mr. Lewis and Mr. James.
Mr. Lewis stopped the bicycle in the middle of the street right in front of Mr. Perrow, and both Mr. Lewis and Mr. James jumped off of the bicycle. Mr. Lewis confronted Mr. Perrow and asked for whatever Mr. Perrow had. Mr. Perrow explained that because he was jogging, he was not carrying anything with him. Mr. Lewis then told Mr. Perrow to continue running. Mr. Perrow had seen a gun in Mr. Lewis' hand, so he began running down Burgundy Street as quickly as he could.
As he ran, Mr. Perrow heard Mr. Lewis yell, "Die, bitch!" A shot was fired, and the bullet broke Mr. Perrow's hip. Mr. Perrow fell onto the street where he had been running, and Mr. Lewis continued to shoot him, causing Mr. Perrow to ask, "Why are you still shooting me?" Mr. Perrow bled profusely after he was shot, and he testified that at that time, he thought he was dying.
Mr. Jeffery Clements, who lived on Burgundy Street, was resting on a couch in his front room when he heard a loud pop that he recognized as a gunshot. He jumped off his couch and put on his jeans which were nearby. While he was putting on his jeans, Mr. Clements heard two more gunshots in quick succession, then after a momentary pause, he heard another shot, and after a second momentary pause, he heard another shot. He heard a total of five gunshots. Mr. Clements' front door was shuttered, and although his door was open, the shutters were not. He unlocked the shutters, threw them open, and saw Mr. Perrow on the ground bleeding. He also saw a young African American male that he later identified as Mr. Lewis tucking something into the waistband of his shorts. He also saw another young African American male, whom he later identified as Mr. James, holding a mountain bike by its handlebars.
*915 As Mr. Clements observed Mr. Lewis turning away from Mr. Perrow, Mr. Lewis looked at Mr. Clements, paused, and then proceeded to get on the bicycle. Mr. James then climbed onto the handlebars of the bicycle, and they rode away from the scene.
As soon as he realized what had happened, Mr. Clements called 911 on his cordless telephone and began administering first aid to Mr. Perrow. The police arrived about five minutes later, and shortly thereafter the emergency medical technicians arrived and began attending to Mr. Perrow.
Another Burgundy Street resident, Antonio Chabera, also witnessed some of the events that morning. He was walking his dog when he saw two young African American men ride past him on his bicycle. They caught his attention, because they appeared to be young, and Mr. Chabera was surprised that they were awake so early on a summer morning. After he saw the two males, who were later identified as Mr. Lewis and Mr. James, he continued walking his dog. He entered an empty lot at the corner of Burgundy Street and Elysian Fields Avenue, and he observed the two men ride down Burgundy Street on the bicycle. Minutes later, he heard five gunshots. He ran into the street and saw the same two men that he had seen minutes before. They were getting on their bicycle. Mr. Chabera ran into a nearby bar to ask someone to call the police, and he then ran to help Mr. Perrow. When he saw that Mr. Clements was assisting Mr. Perrow, Mr. Chabera ran in the direction traveled by the bicycle. He saw the bicycle turn down Touro Street toward Claiborne Avenue.
Mr. Perrow, Mr. Clements, and Mr. Chabera all were shown photographic line-ups. On the day that Mr. Perrow was shot, New Orleans Police Department Officer Jeff Jacob showed two sets of six photographs each to Mr. Clements and Mr. Chabera separately. Neither was able to identify anyone in the line-up. Approximately two weeks later, Officer Jacob had become aware of new suspects, and Mr. Clements and Mr. Chabera both participated separately in two additional photographic line-ups. Both Mr. Clements and Mr. Chabera identified Mr. Lewis and Mr. James as the perpetrators of the crimes against Mr. Perrow. Because of his injuries, Mr. Perrow was unable to participate in the initial line-ups, but he was shown the second photographic line-up, and he identified Mr. Lewis as the man that he believed shot him and Mr. James as the second perpetrator.
At trial Mr. Perrow, Mr. Clements, and Mr. Chabera all identified Mr. Lewis in court as one of the two people who perpetrated the crimes against Mr. Perrow, and they all testified that they were certain that their identifications were accurate. Both Mr. Clements and Mr. Chabera recalled that Mr. Lewis had at least one gold tooth, but they did not recall seeing the tattoos that were on Mr. Lewis' arms at the time of the trial. Finally, Mr. Perrow testified that Mr. Lewis was the person who shot him, and Mr. Clements testified that when Mr. Lewis looked at him at the crime scene, he saw Mr. Lewis put something, which could have been a gun, in his waistband. Therefore, Mr. Clements had assumed Mr. Lewis was the perpetrator who had fired the gun.

Crimes Against Mr. Williams
At approximately 9:30 p.m. on the same day that the crimes against Mr. Perrow were perpetrated, Mr. Williams was the victim of an armed robbery, and he was also shot. Shortly after Mr. Williams closed the clothing store that he owned, he drove to his home at Villere Street and Elysian Fields Avenue. He parked his *916 car, set the car alarm, and then saw a man step out of the alleyway next to his residence. Mr. Williams focused his attention on the man, because there was no reason for him to be in the alleyway. Mr. Williams observed the man looking up and down the street to determine whether anyone was nearby. The man then took a gun from his waistband and pulled a bandana that had been around his neck over the lower part of his face. He then approached Mr. Williams and said, "Bitch, don't move, I got you." Mr. Williams dropped the keys he was holding and offered to give the man everything in his possession. In response, the man thrust the gun into Mr. Williams' side and told him to pick up the keys. The man then forced Mr. Williams to walk up the steps to his house. When he reached the landing at the top of the first flight of stairs, Mr. Williams observed a second man on the landing. The second man was armed with a gun, and Mr. Williams saw him pull a bandana over the lower part of his face. The second man then put his gun against Mr. Williams' neck, while the first man still had his gun in Mr. Williams' side. With an armed man on both sides of him, Mr. Williams was forced to open an iron gate in front of the door to his house while one of the robbers said, "Open the mother fucking gate or I'm going to blow your fucking head off. Bitch, open that gate." Mr. Williams opened the gate, and put a key into a lock on his front door. Just as the front door opened, Mr. Lewis shot him and said, "Bitch, I ain't playing."
Mr. Williams testified at trial that while he was being forced into his home at gunpoint, he had been calling his wife, trying to alert her to the situation. When she came to the front door of their house, Mrs. Williams saw her husband bleeding and standing between two men. One of the men, later identified by Mr. Williams as Mr. James, said to her, "Bitch, bring me to the money." He then grabbed her and forced her to go though the house in a search for money while he continually threatened her. When Mrs. Williams was unable to satisfy his demands for money, Mr. James took her into the kitchen where Mr. Williams was already lying on the floor, having been forced into the kitchen by Mr. Lewis who held a gun to Mr. Williams' head. Mr. James ordered Mrs. Williams to get on the floor, also. Mr. Williams then asked the two men not to hurt his wife, and he stood up, went to the kitchen stove, and retrieved some money that was hidden in a vent. Mr. James took the money that had been hidden and ran out of the Williams' house. Mr. Lewis forced Mr. Williams at gunpoint to walk back to his front door, where Mr. Lewis shot Mr. Williams a second time and then fled.
While Mr. Williams was in the hospital recovering from his gunshot wounds, he saw a replay of a news broadcast showing the photographs of two men who had been arrested in connection with the shooting and attempted robbery of a male jogger. Mr. Williams testified at trial that he immediately recognized the perpetrators of the attack on the jogger as the men who had shot and robbed him. Mr. Williams immediately notified the police that the two men who had robbed and shot him were shown on a news broadcast that he had seen. Mr. Williams was subsequently shown two photographic line-ups. He identified Mr. Lewis as the person who had been in the alleyway and who had shot him twice. He identified Mr. James as the person who had held his wife at gunpoint. At trial, Mr. Williams identified Mr. Lewis in open court as the person who shot him. Mr. Williams testified that he had a very clear view of Mr. Lewis in the alleyway outside of his house, because a high intensity *917 light from a utility pole was illuminating Mr. Lewis' face.

Medical Testimony
Dr. Ralph Lupin testified at trial as an expert witness in forensic physiology. He testified that he had examined the medical records of both Mr. Perrow and Mr. Williams. Mr. Perrow's medical records showed that he had sustained a number of significant gunshot wounds to the abdomen. One of the bullets perforated Mr. Perrow's intestines and caused a serious infection. Mr. Williams' medical records reflected that a bullet penetrated his liver, causing massive bleeding and severe injury to the organ. Both Mr. Perrow and Mr. Williams required numerous surgical procedures. Dr. Lupin opined that if the extraordinary expertise of the Charity Hospital physicians in responding to trauma had not been available to Mr. Perrow and to Mr. Williams, they would have both died from their wounds.

The Defense
The defense presented two witnesses, Roshawn Nobles and Mr. James. Ms. Nobles testified that Mr. Lewis was her boyfriend and that they had two children together. She further testified that Mr. Lewis was with her at all times on the day that the crimes were perpetrated against Mr. Perrow and Mr. Williams. She recalled that she and Mr. Lewis were babysitting at her mother's apartment where they were staying a few days. She also testified that Mr. Lewis' grandmother had called at approximately 7:00 a.m. on the day the crimes were committed and that the call had awakened her and Mr. Lewis.
Mr. James testified at trial that his name was, in fact, Lawrence James but that he was booked in connection with the crimes against Mr. Perrow and Mr. Williams under the name Raymond Williams. He testified that he had participated in the crimes against Mr. Perrow and against Mr. and Mrs. Williams. He admitted that he pled guilty to charges in connection with these crimes and stated that Mr. Lewis was not involved in them. He testified that a man known to him only as "Peanut" was the person who shot Mr. Perrow and Mr. Williams. Mr. James did not know Peanut's name or address, and Mr. James was unable to explain why he and Peanut decided to commit the crimes together. He did say, however, that he and Peanut were both robbers and that "two people that rob people automatically going to bump heads." Mr. James denied that he had ever told the police that Mr. Lewis was involved in the crimes. The State, however, presented a rebuttal witness, New Orleans Police Department Sergeant Charles Watkins, who testified that Mr. James made an oral statement in which he had said that Dimarco Lewis was the person who had shot Mr. Perrow and Mr. Williams.

ERRORS PATENT
We find no errors patent in this case.[3]

*918 DISCUSSION
Mr. Lewis has raised two specific assignments of error on appeal. In his first assignment of error, he contends that it was error for the trial court to permit the State to try the charges against him in connection with two separate criminal incidents in a single trial. In his second assignment of error, he contends that the sentence he received was excessive.
Assignment of Error No. 1: It was error to permit the State to try the Perrow and Williams counts together in one trial.

Severability of Offenses
La. C.Cr.P. art. 493 provides as follows:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
La.C.Cr.P. art. 495.1 further provides that "[i]f it appears that a defendant or the state is prejudiced ... by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."
In State v. Washington, 386 So.2d 1368 (La.1980), the Louisiana Supreme Court discussed the severability of offenses. The Supreme Court stated:
[T]he trial court must weigh the possibility of prejudice versus the important considerations of judicial economy and administration. In determining whether prejudice may result from the joinder, the court should consider whether the jury would be confused by the various counts; whether the jury would be able to segregate the various charges and evidence; whether the defendant could be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition and finally, whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.
Id. at 1371.
In State v. Williams, 418 So.2d 562 (La.1982), the Louisiana Supreme Court stated that a motion for a severance of offenses "is addressed to the sound discretion of the trial court and the court's ruling should not be disturbed on appeal absent a showing of an abuse of discretion." Id. at 564. In State v. Celestine, 452 So.2d 676, 680 (La.1984), the Supreme Court further stated that "[w]e have held that there is no prejudicial effect from the joinder of two or more offenses when the evidence of each offense is relatively simple and distinct, even though such evidence might not have been admissible in separate trials of the offenses, because, with a proper charge, the jury can easily keep the evidence of each offense separate in its deliberations."
In State v. Lebreton, XXXX-XXXX, p. 12 (La.App. 4 Cir. 10/8/03), 859 So.2d 785, 794, this Court stated that if the facts of each offense are not complex, and if there is little likelihood that the jury will be confused by the evidence of more than one crime, there is no prejudice, and severance of the offenses is not required. This Court also stated that "[t]he defendant has a heavy burden of proof when alleging prejudicial joinder of offenses, and *919 he must make a clear showing of prejudice." Id.
Based on the foregoing, if the offenses charged are triable by the same mode of trial and if the trial court judge did not abuse his discretion in determining that the offenses could be tried together, we must affirm the trial court's decision. In the instant case, all of the charges against Mr. Lewis were triable by a jury composed of twelve jurors, ten of whom were required to concur to render a verdict. See La.C.Cr.P. art. 782(A)[4]. Therefore, the joined offenses in the instant case were triable by the same mode of trial.
In determining whether the trial court judge abused his discretion in permitting all of the offenses charged against Mr. Lewis to be tried in a single trial, we must consider the criteria for determining prejudice that were set forth in the Williams case. In the instant case, the facts of each offense were simple and each of the criminal incidents was a completely separate event with its own set of witnesses[5] such that the jury would not have been confused by the various counts and would have been able to segregate the charges and the evidence. Mr. Lewis was not confounded in presenting his defense. In fact, he presented the same defense to both criminal incidents: an alibi to account for his presence at a place other than the crime scenes and the testimony of Mr. James that a man named Peanut, not Mr. Lewis, was Mr. James' accomplice in the two criminal incidents. Because the defendant did not dispute that the same two men, Mr. James and Peanut, participated in both criminal incidents, the charges would not be used by the jury to infer a criminal disposition. Finally, there was no evidence that because the charges were not severed, the jury was hostile. Therefore, we find that the Williams criteria were met and that Mr. Lewis suffered no prejudice from having the charges against him joined at trial.

Effectiveness of Counsel
We note that Mr. Lewis has raised an underlying issue in connection with his first assignment of error. He contends that because his trial attorney did not move to sever the charges against him, he was denied effective assistance of counsel. With regard to raising on appeal a claim of ineffective assistance of counsel, the Louisiana Supreme Court stated in State v. Prudholm, 446 So.2d 729 (La.1984), that a "defendant's remedy is through post conviction relief in the trial court where the quality of the attorney's assistance can be fully developed and explored." Id. at 737. In State v. Ratcliff, 416 So.2d 528 (La.1982), however, the Louisiana Supreme Court determined that "[s]ince the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue was raised by assignment of error on appeal, in the interest of judicial economy we will address the issue now". Id. at 530. See also State v. Seiss, 428 So.2d 444 (La.1983). In the instant case, this Court finds that an evidentiary hearing at the trial court level is not necessary, because the record before us is sufficient for the determination of counsel's effectiveness at trial.
In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *920 the Supreme Court of the United States articulated the test for determining the effectiveness of a criminal defendant's counsel as follows:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
466 U.S. at 687, 104 S.Ct. at 2064.
Louisiana courts have adopted the two-pronged test established in the Strickland case for determining the effectiveness of counsel. See, e.g., State v. Fuller, 454 So.2d 119 (La.1984); State v. Wilson, XXXX-XXXX (La.App. 4 Cir. 11/14/01), 803 So.2d 102.
In State v. LaCaze, 99-0584 (La.1/25/02), 824 So.2d 1063, the Louisiana Supreme Court discussed the effective assistance of counsel that a criminal defendant is afforded. The Supreme Court stated as follows:
A criminal defendant is guaranteed the effective assistance of counsel. U.S. Sixth Amendment; La. Const. art. I § 13. To prevail on a claim of ineffective assistance, a defendant must demonstrate (1) that his attorney's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel's errors or omissions resulted in prejudice so great as to undermine confidence in the outcome. The Sixth Amendment does not guarantee "errorless counsel [or] counsel judged ineffective by hindsight," but counsel reasonably likely to render effective assistance. Judicial scrutiny must be "highly deferential" and claims of ineffective assistance are to be assessed on the facts of the particular case as seen from "counsel's perspective at the time," hence, courts must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

99-0584, p. 20; 824 So.2d at 1078-79 (footnotes omitted and emphasis added).
In State v. Brooks, 505 So.2d 714 (La.1987), the Louisiana Supreme Court stated that "hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." Id. at 724. This Court has also recognized that if the trial counsel's actions fall "within the ambit of trial strategy", they do not "establish ineffective assistance of counsel." State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986).
We have already found that Mr. Lewis suffered no prejudice by having the charges against him in the two criminal incidents adjudicated in a single trial. Therefore, because the failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel, Mr. Lewis' claim of ineffective assistance of counsel is without merit. We also note that it may have been part of the trial counsel's trial strategy to have all of the charges tried in one proceeding. The trial counsel successfully brought a motion to sever Mr. Lewis' trial from that of Mr. James, and he may have considered it to *921 be to Mr. Lewis' advantage to have all of the charges tried in one case. Had the jury believed Mr. James' testimony, Mr. Lewis would have been exonerated on all of the crimes without having to undergo another trial.
Based on the foregoing discussion we find that Mr. Lewis suffered no prejudice by having all the charges against him considered in a single trial. Therefore, we find his first assignment of error to be without merit.

Assignment of Error No. 2: The trial court imposed an excessive sentence.
Mr. Lewis contends that imprisonment at hard labor for two hundred and three years[6] without the possibility of probation, parole, or suspension of sentence is the equivalent of a life sentence. Therefore, he argues that his sentence violates the constitutions of both the United States and the State.
The Louisiana Constitution expressly provides that "[n]o law shall subject any person to cruel, excessive, or unusual punishment." La. Const. art. 1, 20. Although the United States Constitution does not expressly prohibit "excessive punishment", it does prohibit "cruel and unusual punishment." U.S. Const. amend. VIII.
In State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, 977, the Louisiana Supreme Court stated that the deliberate inclusion of the prohibition against excessive sentences in the state constitution by its redactors imposed on the court the duty to review the sentencing provisions of criminal statutes. The Supreme Court further stated that the court is permitted to determine both whether the statutory range of sentences and the sentence of a particular offender is excessive, even if that offender's sentence were within the prescribed statutory range. Id.
In State v. Bonanno, 384 So.2d 355 (La.1980), the Louisiana Supreme Court discussed the criteria for determining whether a sentence is unconstitutionally excessive as follows:
[T]o determine whether a certain penalty is excessive we must determine whether that penalty is grossly disproportionate to the severity of the crime. To determine whether the penalty is grossly disproportionate to the crime we must consider the punishment and the crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice.
384 So.2d at 358 (citations omitted).
In State v. Soco, 441 So.2d 719 (La.1983), the Supreme Court also stated that "[m]aximum sentences provided by the statutes are reserved for the `worst kind of offender'." Id. at 720, citing State v. Quebedeaux, 424 So.2d 1009, 1014 (La.1982). The Supreme Court further stated:
In order for there to be proper review of the sentence to determine its constitutionality, La. Const. art. 1, § 20, that is, whether the defendant is the worst kind of offender, an adequate record specifying the basis for the sentence must be made. This record is mandated by *922 C.Cr.P. 894.1, which also provides the sentencing judge with guidelines to follow when passing sentence.
Id. The Supreme Court has also stated that "[i]f the judge records the factors affecting his sentencing decision, the sentence should not be set aside as excessive unless it is grossly disproportionate to the offense or represents nothing more than the needless infliction of pain and suffering." State v. Pike, 426 So.2d 1329, 1335 (La.1983)
In the instant case the trial court judge adequately complied with the statutory sentencing guidelines under La.C.Cr.P. art. 894.1, and he made his finding in connection with those guidelines part of the record. He found that Mr. Lewis' conduct during the commission of his crimes "manifested deliberate cruelty to the victims." He considered all of the mitigating circumstances listed in article 894.1, and he found no mitigating circumstances. Additionally, Mr. Lewis offered no evidence of mitigating factors at the sentencing hearing, and he suggests none in his brief.
At Mr. Lewis' sentencing hearing, the trial court judge described Mr. Lewis' crimes as follows:
[W]e have one victim in this case that was going to jog in the morning, which was the favorite thing he had to do every day.... And you go out and attempt to rob him. And when he didn't give you any money, you shot him five times and left him to die in the street.... You leave there and later that night go to Mr. Williams' home and go into his home, shoot him, drag his wife around, beat her up and steal their life savings. And then your comment that you make today is, Well [sic], I'm not a robber, I'm a drug dealer....
We also note that at the sentencing hearing Mr. Lewis stated, "I feel like my lawyer laid down on me, my lawyer ain't do this, my lawyer ain't do that I don't have to rob, man. I sell drugs." We also find that the trial court judge had more than sufficient grounds for his determination that Mr. Lewis was without remorse.
The trial court judge imposed the maximum sentence on each count of which Mr. Lewis was convicted, but he did not order the sentences on the offenses perpetrated against Mr. Perrow to run consecutively to the sentences on the offenses perpetrated against Mr. and Mrs. Williams, as he could have done. See La.C.Cr.P. art. 883. Therefore, Mr. Lewis did not even receive the maximum number of years that he could have been required to serve for his crimes.
We find that the crimes perpetrated by Mr. Lewis are abhorrent and that he is clearly among the worst offenders for whom the maximum sentences are reserved. He showed no remorse for his crimes, and one of his victims, Mr. Perrow, will suffer from permanent physical problems as a result of his injuries. Both Mr. Perrow and Mr. Williams have endured enormous pain and suffering throughout their multiple surgical procedures.
The sentence imposed on Mr. Lewis does not shock our sense of justice. It does not represent the needless infliction of pain and suffering, and it was imposed by the trial court judge after thoughtful consideration of applicable sentencing guidelines. The trial court judge in no way abused his discretion in imposing a sentence of two hundred and three years on Mr. Lewis. In this particular case, that sentence is not excessive. Mr. Lewis' assignment of error regarding the excessiveness of his sentence is without merit.

CONCLUSION
We find no errors in the judgment of the trial court. Mr. Lewis' convictions and sentences are affirmed.

*923 AFFIRMED.
NOTES
[1] Mr. James used the alias Raymond Williams.
[2] Although Mr. James was originally charged with two counts of attempted second degree murder, one of the counts was amended to a count of being an accessory after the fact to second degree murder.
[3] La. R.S. 14:64.3 provides that "[w]hen the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned for an additional period of five years without benefit of parole, probation, or suspension of sentence." (Emphasis added.) Although it may be arguable that the State's failure to move to have this provision invoked prior to the trial in some cases is an error patent, we do not find that it was in this case. The indictment in this case charged Mr. Lewis with committing an armed robbery while armed with a gun. Therefore, we do not find that the State's failure to invoke the sentence enhancement provisions of La. R.S. 14:64.3 prior to Mr. Lewis' conviction violated his right to due process. The jury was certainly aware that the armed robbery of which Mr. Lewis was accused was committed with a firearm, since the irrefutable evidence presented at trial showed that victim was shot twice.
[4] La.C.Cr.P. art. 782(A) provides in relevant part that "[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict."
[5] The only common witnesses presented by the State were Dr. Lupin, the expert in forensic physiology, and Sergeant Watkins, who testified only as a rebuttal witness to impeach the testimony of Mr. James.
[6] Mr. Lewis was sentenced to one hundred ninety-eight years on one count of armed robbery under the Habitual Offender Law, La.R.S. 15:529.1. He was sentenced to an additional five-year term under La. R.S. 14:64.3(A), which provides that "[w]hen the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned for an additional period of five years without benefit of parole, probation, or suspension of sentence." La. R.S. 14:64.3(A) further provides that the additional penalty shall be served consecutively to the sentence for the armed robbery conviction. Therefore, Mr. Lewis is serving a sentence of two hundred and three years.