DAVID S. GORBATY, Judge.
h Louis Nix appeals his convictions for manslaughter and attempted second degree murder and sentences of forty years and fifty years, respectively. For the following reasons, we affirm the convictions and sentences.
PROCEDURAL HISTORY:
On July 5, 2006, Louis Nix was indicted for the second degree murder of Gary McGlothen and the attempted second degree murder of Carl Jiminez. Nix filed a motion to sever counts, which was denied. At the close of a two-day trial, a twelve-person jury found Nix guilty of the responsive verdict of manslaughter and guilty as charged as to the attempted murder count. The court sentenced Nix on the manslaughter count to serve forty years at hard labor without benefit of probation or suspension of sentence, and on the attempted second degree murder count to serve fifty years at hard labor without benefit of parole, probation, or suspension of sentence, the sentences to run consecutively. The court also denied Nix’s motion to reconsider sentence, but granted the motion for appeal.
FACTS:
Louis Nix was charged with the murder of Gary McGlothen, which occurred on the night of March 29 or the morning of *857 March 30, 2006. Dr. Dana Troxclair, an expert in forensic pathology, conducted McGlothen’s autopsy. She testified that ^McGlothen died of a knife wound to his left eye that entered his brain. She testified that the knife was still in McGlothen’s eye when she started the autopsy, and it penetrated his brain, lodging against his skull just above his right ear. She stated that McGlothen also had a stab wound to his upper left chest. She stated that his blood tested positive for cocaine. She also viewed photographs taken of McGlothen at the murder scene that showed what she described as moderate rigor mortis. Dr. Troxclair estimated that rigor mortis usually peaks at twelve hours after death and disappears within twenty-four to thirty-six hours after death.
Giselle Bertrand testified that she was a 911 complaint operator for N.O.P.D. on March 30, 2006. She identified a printout of a call for assistance received at 5:58 a.m. from 3501 Garden Oaks Drive. She also identified the tape of the 911 call, which was played for the jury, but not transcribed for the record.
Nicole Gibson testified that on March 29, 2006 she lived in an apartment on Garden Oaks Drive in the Jackson Landing Apartments. She testified that sometime after 10:00 p.m., a friend called to say he was coming to visit. She stated that because her friend had not been to her apartment before, she went outside to wait for him, taking her cell phone with her. She waited outside about twenty minutes when her friend called around 10:35 p.m. to tell her that he was in the parking lot. A car was parked nearby, and she thought her friend might be in it, playing a trick on her. She walked up to the car, which had the passenger window down. She could see a man in the passenger seat, and later identified the man as the defendant Louis Nix. Another man was in the driver’s seat.
She testified that when she discovered that she had gone to the wrong vehicle, she quickly apologized and backed away because she was wearing her “night clothes.” She testified that the passenger told her it was all right.
|aMs. Gibson testified that she then saw her friend’s truck on the other side of the parking lot, and she walked over to meet him. She testified that the car containing Nix and the other man was not parked in a parking place, but was merely stopped in the parking lot, and it was partially blocking her car. She testified that as she and her friend began walking back to her apartment, she saw the brake lights of the car go on. Ms. Gibson testified that she said in a very loud voice as they passed the car that she would be late to work again in the morning because people were always blocking her car. She testified that she looked over at the car and noticed that the passenger window was now closed and that the passenger had departed. She and her friend went into her apartment. She stated that when her friend left sometime between 12:30 and 1:00 the next morning, the car was still there, but she did not go outside at that time. Later that morning, when she left her apartment to go to work, Ms. Gibson noticed that the car was still in the same place. She testified that she walked up to the car and yelled to the man sitting in the driver’s seat to move the car. She testified that she looked inside the car and found the victim sitting in the passenger seat with a knife in his eye. She ran back to her apartment and asked her roommate and her cousin to call 911.
Ms. Gibson testified that on April 6, 2006, she viewed a photographic lineup from which she chose Nix’s picture as being the man in the passenger seat of the car in the parking lot. She testified that she was able to see the passenger clearly because of lighting that shone on the car *858 from the apartment complex. Ms. Gibson also identified Nix in court as the man who she saw in the passenger side of the car. She testified that she did not know Nix prior to the incident.
Officer Frederick Carter testified that he was the first officer to arrive on the scene of the murder. He testified that he saw a small white vehicle parked in the 14driveway of 3501 Garden Oaks Drive. He walked up to the vehicle and looked inside, seeing what appeared to be a young man asleep. However, as he got closer to the car, he saw that the man had a knife sticking out of his eye. He testified that the driver’s window was down, but the passenger window was up. He testified that he saw no blood on the passenger side of the car. Officer Carter testified that he was on the scene when EMS personnel arrived, but they were unable to revive the victim. He testified that when the victim was removed from the car, the victim’s body was stiff.
Archie Kaiser testified that McGlothen was his roommate and his best friend. He stated that a few days before the murder he and McGlothen met Nix through mutual friends in New Iberia. He stated that he and McGlothen drove Nix back to New Orleans, and although Nix was supposed to stay with relatives, he asked if he could stay with Kaiser and McGlothen at their residence in Terrytown. Kaiser testified that Nix stayed with them a few days, and some sort of relationship developed between Nix and McGlothen. Kaiser stated that on March 29, the three men returned to New Iberia so that Nix could pick up a paycheck, and then they drove back to New Orleans, arriving at approximately 9:30 p.m. He testified that McGlothen asked to borrow his car, but the car was out of gas, so McGlothen and Nix left together in McGlothen’s car. McGlothen told Kaiser that he would return shortly.
Kaiser testified that he called McGlothen at approximately 10:10, and at that time he could hear Nix’s voice in the background. Kaiser testified that he tried to call McGlothen at approximately 10:45, but McGlothen did not answer his cell phone. McGlothen did not return home.
Kaiser testified that he spoke with detectives the next morning concerning McGlothen’s murder. Some time later, he viewed a photographic lineup from Dwhich he chose Nix’s photo. Kaiser testified that Edward Turner was also staying at his residence during part of the time that Nix was staying there, but he insisted that Turner left town a few days before the murder. He stated that Turner previously knew Nix. On cross-examination, Kaiser admitted that he and Turner had been lovers for several years in the past. On redirect, Kaiser testified that Nix never returned to his residence or contacted him after leaving with McGlothen on the night of the murder.
Edward Turner testified that he knew Nix, Kaiser, and McGlothen. He testified that he saw Nix at Kaiser’s home on the day before the murder. At that time, he and Kaiser argued. Turner testified that Nix was upset that day, and Nix told him that he knew that McGlothen had $10,000 in his bank account and that Nix knew the personal identification number for the account. Turner testified that Nix told him that he wanted to kill McGlothen in order to get the money out of the account. Turner testified that he responded that he wanted no part of Nix’s plan. Turner stated that he did not speak with Nix again after this conversation, and he insisted that he was in California at the time of the murder.
On cross-examination, Turner testified that Kaiser and McGlothen were romantically involved. Turner testified that he went with Kaiser and McGlothen to New *859 Iberia to pick up Nix. He admitted that he did not inform the police about Nix’s plan to kill MeGlothen for his money. He also admitted that he had prior convictions for solicitation and purse snatching.
Bessie Johnson, of N.O.P.D.’s crime lab, testified that she processed the scene of the murder, taking photographs and lifting fingerprints. She testified that she lifted two prints for the exterior of the front passenger door window, and she collected a blood sample from the interior front middle console.
| (¡Detective Barrick Morton testified that he was the lead investigator for the murder. He testified that he took statements from various witnesses, including Ms. Gibson. He also showed Ms. Gibson a photographic lineup from which she chose Nix’s picture. He then obtained an arrest warrant for Nix.
Officer Timothy Sisón testified that he arrested Nix on May 11, 2006 at an apartment on Garden Oaks Drive. He testified that he received a tip that Nix was in the apartment, and he found Nix hiding under a bed.
On the second day of trial, the State presented evidence concerning the attempted murder of Carl Jiminez. Detective Daniel Lohman testified that on April 22, 2006, he received a call of an aggravated battery by stabbing occurring at 103 Brunswick Court. Detective Lohman testified that several days later he interviewed Jiminez at that address. He testified that he showed Jiminez a photographic lineup from which Jiminez chose Nix’s photo as the man who stabbed him.
Carl Jiminez testified that at the time of the stabbing he lived with Derrick Hatcher at the Brunswick Court address. Jiminez testified that shortly before the stabbing, Hatcher brought Nix home with him and asked if Nix could stay there temporarily. Jiminez replied that Nix could stay in the FEMA trailer parked in the front yard of the residence. Jiminez testified that on April 22, Nix went with him to pick up his truck from the mechanic shop, and the two drove back to the residence. He allowed Nix to come inside the residence to watch television. Nix asked him if he could borrow $80 to take his girlfriend to a club, and Jiminez declined the request. Jiminez testified that he told Nix that he would drive Nix and his girlfriend to the club, and Nix replied that his girlfriend would come over to the residence after she got off of work at midnight. Jiminez testified that he worked |7around the house and then decided to take a nap until it was time to drive Nix and his girlfriend to the club.
Jiminez testified that at approximately 11:30 p.m., he was sleeping when Nix entered his room and called to him. Nix then stabbed him above his right eye. He stated that Nix continued stabbing him in his right upper arm, his right lower arm, and the left side of the top of his chest. Jiminez testified that he rolled off of the bed, and Nix told him to give him his money, wallet, and keys. Jiminez threw his wallet through the door into the living room, and when Nix went to get it, he closed and locked the bedroom door. Jim-inez heard the front door open. He looked out his bedroom window, and saw Nix out in the front of the house. Jiminez then went into the living room, locked the front door, and went into the kitchen to call for help. While he was trying to summon help, he heard the front door open, and he saw Nix reenter the residence, using Hatcher’s keys. Jiminez stated that Nix told him that he could not use Hatcher’s car because the battery was dead, and he wanted the keys to Jiminez’ truck. Jimi-nez testified that he picked up a small table and used it as a shield against Nix. Nix waved the knife at him and then threw the knife and ran out the door. Jiminez *860 testified that he picked up an umbrella and gave chase, yelling for someone to call the police. However, Nix escaped.
Jiminez testified that the knife that Nix used to stab him came from the FEMA trailer. Jiminez described his various wounds, including one that went to his bone and was still numb at the time of trial. He testified that one stab wound broke his collar bone, and the wounds to his chest and forearm bled profusely. He testified that he later met with police officers who showed him a photographic lineup from which he chose Nix’s photo as the man who stabbed him. He also |Ridentified photographs taken at his residence that showed blood in several rooms. On cross-examination, Jiminez denied that he and Hatcher were lovers, describing them as merely roommates. He denied having a knife that night.
Louis Nix denied stabbing either Jimi-nez or McGlothen. He testified that he met Jiminez through Hatcher, and he testified that he stayed with them inside their residence, not in the FEMA trailer in the yard. He testified that on April 22, he was watching television inside the residence when Jiminez and Hatcher left. He testified that Jiminez returned alone, telling him that Hatcher had been arrested and that he was going to bail him out the next day. Nix testified that Jiminez began pacing around the living room, and then he sat down next to Nix. Nix stated that Jiminez appeared to be under the influence of something. Nix stated that Jimi-nez then put his arm around the back of Nix’s chair, and Nix told him to move his arm. Nix stated that Jiminez complied, but he soon put his arm back around the chair and offered Nix money in exchange for sex. Nix testified that he replied that he had a girlfriend and did not mess around with men. Nix testified that Jimi-nez repeatedly offered him money, which Nix repeatedly refused. Nix stated that Jiminez then got upset and yelled at Nix to leave. Nix stated that he refused to do so because he had paid Jiminez money to stay at the residence. Nix testified that Jimi-nez then went into the kitchen and came back with a knife. Nix testified that he flipped over a table and agreed to leave. He stated that Jiminez then charged at him as he came around the table, and Nix picked up the table. Nix testified that Jiminez then fell and dropped the knife. Nix stated that he picked up the knife and stabbed Jiminez an unknown number of times, then dropped the knife and ran from the residence. He admitted that he did not call the police about the incident. He also admitted that he had prior convictions for simple robbery and battery.
LOn cross-examination, Nix denied asking Jiminez for money or asking him to take him and his girlfriend to a club. He testified that he did not leave the residence when Jiminez first asked him to have sex because he had nowhere to go. He testified that after Jiminez dropped the knife, he picked it up, but then dropped it as he began walking out of the residence. He stated that Jiminez then picked up the knife again and cut him on his hand. The two men wrestled, and Jiminez again dropped the knife. Nix stated that he picked up the knife a second time and stabbed Jiminez. He then dropped the knife and left, and as he was leaving he saw Jiminez getting up from the floor. He insisted that he stabbed Jiminez because of “sexual activities.”
With respect to McGlothen’s murder, on direct examination Nix testified that he met him through friends in New Iberia. He stated that he came to New Orleans with McGlothen and stayed at his house. He testified that he knew Turner, but he denied telling Turner about McGlothen’s bank account or his intent to kill McGloth *861 en; he insisted that he did not know the personal identification number for the account. He testified that McGlothen had loaned him a ring, which he then pawned to his cousin who lived in the apartment complex on Garden Oaks Drive. He testified that the last time he saw McGlothen was when he left McGlothen in his car in the parking lot of the complex. He testified that he left McGlothen’s car to go to his cousin’s apartment to retrieve the ring, but his cousin told him that he had sold the ring to someone else. Nix testified that he did not want to face McGlothen with the news, so he left the apartment and did not return to McGlothen’s car. He insisted that he did not see McGlothen again after he left the car. He admitted that he was hiding when the police arrested him at his stepfather’s apartment, but he maintained that he did not know McGlothen was [indead and that his girlfriend had merely told him that the police were looking for him in connection with a murder.
On cross-examination, Nix testified that he lived with McGlothen and Kaiser for approximately two weeks. He stated that Turner was also staying there at the time. He denied having a relationship with McGlothen and explained that McGlothen had given him the ring because he had admired it. He stated that he gave his cousin the ring because he owed his cousin money for drugs. He denied killing McGlothen to get money to pay back his cousin, and he denied knowing McGlothen had a debit card. He testified that McGlothen drove him to his cousin’s apartment to get the ring, but when he learned that his cousin had sold the ring, he left with his cousin instead of returning to McGlothen’s car. He denied having any conversations with Ms. Gibson while he was sitting in the car with McGlothen prior to going to his cousin’s apartment. He admitted that he did not return to McGlothen’s residence to retrieve his belongings, but he denied knowing that McGlothen had been murdered.
DISCUSSION:
A. Errors Patent:
A review of the record reveals no patent errors.[1]
B. Assignments of Error:
I.
By his first assignment of error, Nix contends that the trial court erred by denying his motion to sever counts. The State tried the second degree murder Incount and the attempted second degree murder count together, even though the incidents occurred over three weeks apart. He argues that trying both counts together unduly prejudiced him because the State used both counts to show his predisposition to commit crime, and he was denied his right against self-incrimination with respect to McGlothen’s murder because he chose to testify in his own behalf as to Jiminez’ stabbing.
La.Code Crim. Proc. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same *862 act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
Nonetheless, La.Code Crim. Proc. art. 495.1 provides that if the defendant or the State is prejudiced by the joinder of offenses in a bill of information or at trial, “the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.” In State v. Deruise, 98-0541, p. 7 (La.4/3/01), 802 So.2d 1224, 1232, the Court discussed the standard for reviewing a trial court’s ruling on a motion to sever counts:
A motion to sever is addressed to the sound discretion of the trial court, and the court’s ruling should not be disturbed on appeal absent a showing of an abuse of discretion. [State v.] Brooks, 541 So.2d [801] at 804 [ (La.1989) ] (citing State v. Williams, 418 So.2d 562, 564 (La.1982)). In ruling on such a motion, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various |iacounts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. Id. (quoting State v. Washington, 386 So.2d 1368, 1371 (La.1980)). However, the fact that evidence of one of the charges would not be admissible under State v. Prieur, 277 So.2d 126 (La.1973), in a separate trial on the joined offense, does not per se prevent the joinder and single trial of both crimes, if the joinder is otherwise permissible. State v. Davis, 92-1623, p. 9 (La.5/23/94), 637 So.2d 1012, 1019 (citing State v. Celestine, 452 So.2d 676 (1984)). Finally, there is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. Brooks, 541 So.2d at 805.
See also State v. Lewis, 03-1234 (LaApp. 4 Cir. 6/2/04), 876 So.2d 912 (one count of attempted armed robbery, one count of armed robbery, and two counts of attempted second degree murder arising out of two separate incidents); State v. Lebreton, 03-0321 (LaApp. 4 Cir. 10/8/03), 859 So.2d 785 (three counts of armed robbery arising out of separate incidents, all at night, in the same area, within ten days); State v. Porche, 01-2086 (LaApp. 4 Cir. 5/22/02), 819 So.2d 1122 (four counts of first degree robbery, one count each of armed robbery, second degree kidnapping, and sexual battery); State v. Lee, 99-1404 (LaApp. 4 Cir. 5/17/00), 764 So.2d 1122 (two counts of armed robbery committed with a gun in the same area within three weeks). In State v. Carter, 99-2234, pp. 34 — 35 (La. App. 4 Cir. 1/24/01), 779 So.2d 125, 145, this Court stated: “Generally, ‘there is no prejudice and severance is not required if the facts of each offense are not complex, and there is little likelihood that the jury will be confused by the evidence of more than one crime,’ ” citing State v. Lewis, 557 So.2d 980, 984 (LaApp. 4 Cir.1990). A | -^defendant bears a heavy burden of proving prejudicial joinder of offenses, and he must make a clear showing of prejudice. Lewis, supra; Lebreton, supra. In each of the cases cited above, the reviewing *863 court found that the trial court did not abuse its discretion by denying the motion to sever counts.
Looking at the Washington factors[2], it does not appear that the trial court abused its discretion by denying the appellant’s motion to sever the counts. The two counts for which the appellant was tried were the murder by stabbing of McGlothen and the attempted second degree murder by stabbing of Jiminez, and in both instances the victims were stabbed in or near the eye. The offenses occurred twenty-three days apart. In each case, the appellant lived with the victim for a short period of time. In addition, the evidence as to the murder count was presented separately from that concerning the attempted murder count; indeed, the evidence of the murder was presented on the first day of trial, while the evidence of the attempted murder was presented the next day. The appellant has not shown that the jurors were confused by the presentation of the evidence or that they could not segregate evidence as to the two counts.
The appellant argues that he was confounded in presenting a defense because he needed to testify as to the attempted murder case in order to show that he stabbed Jiminez in self-defense, but he wanted to invoke his right against self-incrimination as to the murder charge. Nonetheless, the joinder did not hinder his right to present a defense because he chose to testify at trial; he presented his self-defense testimony as to Jiminez’ stabbing. He did not incriminate himself as to McGlothen’s murder, but rather he insisted that McGlothen was alive when he left 1 uthe car to retrieve the ring from his cousin. In addition, the appellant has not shown either of the last two Washington factors, either that the joinder of these two offenses caused the jury to infer a criminal disposition on his part, or that the joinder made the jury hostile. Indeed, although the jury found him guilty as charged as to the attempted second degree murder count, it returned a responsive verdict of manslaughter as to the murder count.
Moreover, a review of the cases cited by the appellant does not show that the trial court abused its discretion by denying the motion to sever the offenses. In all but one case cited, the appellate courts upheld the trial court’s denial of the motion to sever. The Court reversed in State v. Hamilton, 364 So.2d 585 (La.1978), but that case was based upon an earlier version of La.Code Crim. Proc. art. 495.1 and an earlier case, State v. Carter, 352 So.2d 607 (La.1977), which interpreted the earlier incarnation of art. 495.1.
We find that the trial court did not abuse its discretion in denying the motion to sever the counts.
II.
By his second assignment of error, the appellant contends that the State failed to prove beyond a reasonable doubt that he was guilty of manslaughter. He does not dispute that someone killed McGlothen. Instead, he argues that the State failed to prove that he was the person who stabbed Gary McGlothen.
The Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in State v. Brown, 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must deter *864 mine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
See also State v. Batiste, 06-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Sykes, 04-1199, 04-0947 (La.App. 4 Cir. 3/9/05), 900 So.2d 156.
The appellant was charged with second degree murder, but the jury returned a verdict of manslaughter. The appellant does not dispute that the State proved that at the very least a manslaughter occurred. Rather, he argues that the evidence did not prove beyond a reasonable doubt that he was the person who stabbed McGlothen. In State v. Stewart, 04-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639, this Court discussed the sufficiency standard to be employed when a defendant disputes proof of identity:
When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893; State v. Woodfork, 99-0859 (La.App. 4 Cir. 5/17/00), 764 So.2d 132. The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):(1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior | ^description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. See State v. Brealy, 2000-2758 (La.App. 4 Cir. 11/7/01), 800 So.2d 1116.
See also State v. Mathieu, 07-0204 (La. App. 4 Cir. 2/27/08), 980 So.2d 716.
In this case, the Manson factors are satisfied because both Ms. Gibson and the appellant himself placed him on the scene of the murder while McGlothen was still alive. Nonetheless, the appellant argues that the State failed to prove that he was the person who stabbed McGlothen. He points out that there was no physical evidence to tie him to the murder. He acknowledges that he was on the scene prior to the murder. Indeed, Ms. Gibson identified him as the man she saw sitting in the passenger seat of McGlothen’s car while McGlothen was still alive, and the appellant admitted at trial that McGlothen drove him to the apartment complex so that he could retrieve McGlothen’s ring that he had given to his cousin in exchange for money he owed his cousin. He nonetheless argues that anyone could have approached McGlothen and stabbed him while McGlothen was sitting in the car after the appellant left to go to his cousin’s apartment. He theorizes that Kaiser knew where they were going and could have killed McGlothen in a jealous rage. The appellant maintains that while the evidence may have led the jury to suspect *865 that he was the person who stabbed MeGlothen, it was not sufficient to prove beyond a reasonable doubt that he committed the murder.
The evidence showed that MeGlothen drove the appellant to the scene of the murder and that the men were together in the car prior to the murder. The appellant admitted that they went to the apartment complex in order to retrieve a ring that MeGlothen had given him and that the appellant had pawned to his cousin in exchange for money he owed his cousin for drugs. The appellant also testified 117that when he got to his cousin’s apartment, he learned that his cousin had sold the ring. The appellant admitted that he did not want to tell MeGlothen about the ring because MeGlothen would be upset. The appellant did not return to McGlothen’s residence to pick up his belongings after the murder. In addition, although there was no evidence that any money was taken from MeGlothen, Edward Turner testified that the appellant told him a few days before the murder that he wanted to kill MeGlothen to get money from McGlothen’s bank account. Finally, there was absolutely no evidence showing that Kaiser was on the scene of the murder that night, negating the appellant’s theory that Kaiser stabbed MeGlothen in a jealous rage.
Even though the evidence was circumstantial, viewing it in the light most favorable to the prosecution, the jury could have found beyond a reasonable doubt that the appellant was the person who stabbed MeGlothen to death. This assignment is without merit.
III.
The appellant also contends that the evidence was insufficient to support his attempted second degree murder conviction. He does not dispute identity as to this count; rather, he argues that the offense was at best an attempted manslaughter or an aggravated battery because the State did not prove an intent to kill or inflict great bodily harm.
The standard for reviewing a claim of insufficient evidence was set forth above in the discussion of assignment of error two and is equally applicable to this assignment. In order to support the appellant’s conviction for attempted second degree murder, the State had to prove that the appellant had the intent to kill, not just inflict great bodily harm, and that he committed an overt act tending toward | isthe accomplishment of the victim’s death. See La.Rev.Stat. 14:27; 14:30.1; State v. Bishop, 01-2548 (La.1/14/03), 835 So.2d 434. La.Rev.Stat. 14:10(1) defines specific criminal intent as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act.” Specific intent may be inferred from the circumstances and actions of the defendant. Brown; State v. Williams, 05-0459 (La.App. 4 Cir. 1/18/06), 925 So.2d 567, writ denied 06-1029 (La.11/3/06), 940 So.2d 658; State v. Hebert, 00-1052 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041. Specific intent can be formed in an instant. Williams, supra; State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382.
The appellant argues that the evidence was insufficient to support his attempted second degree murder conviction because the State failed to prove that Jiminez’ injuries constituted great bodily harm, citing several cases that defined great bodily harm with respect to other offenses. However, as noted above, the intent to inflict great bodily harm is not an element of attempted second degree murder; the perpetrator must have an intent to kill the victim.
*866 The appellant argues that the stabbing occurred as he was trying to defend himself when he rejected Jiminez’ sexual advances, and Jiminez armed himself with a knife. However, Jiminez testified that the appellant attacked him with the knife while he was sleeping in his own bed and that the appellant stabbed him several times, above his eye, on his arm, and in his chest, before Jiminez was able to roll off of the bed and begin defending himself. Jiminez testified that the appellant demanded Jimi-nez’ money, wallet, and keys, and the appellant left the bedroom only after Jiminez threw his wallet into the living room. Jim-inez testified that after he locked the bedroom door, the appellant left the house, but he returned |19and again lunged at Jiminez with the knife. Apparently the jury chose to believe Jiminez’ testimony over that of the appellant. This Court has repeatedly held that a factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 00-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. There is nothing in the record before this Court to indicate that the jury’s credibility finding is clearly contrary to the evidence.
Although the jury did not view Jiminez’ medical records because the State introduced them for record purposes only, Jimi-nez showed the jury the scars he still had from his injuries. Viewing the evidence in the light most favorable to the prosecution, the jury could well have rejected the appellant’s testimony and have found that the appellant had the intent to kill Jiminez when he repeatedly stabbed him. This assignment of error has no merit.
IV.
By his fourth assignment of error, the appellant contends that the trial court erred by allowing the State to introduce gruesome photographs. He argues that the victim’s injuries were fully explained by the testimony of the witnesses, and thus the photographs were merely cumulative. He maintains that the nature of the photographs rendered them unduly prejudicial.
In State v. Cuccia, 05-0807, p. 46 (La. App. 4 Cir. 3/15/06), 933 So.2d 134, 164-165, writ denied 06-0903 (La.10/27/06), 939 So.2d 1273, this Court discussed the standard for review of a claim of prejudice due to gruesome photographs:
The state is entitled to the moral force of its evidence, and postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death, the location and placement of wounds, and to the positive Lnidentification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776, citing State v. Watson, 449 So.2d 1321, 1326 (La.1984) and State v. Kirkpatrick, 443 So.2d 546, 554-555 (La.1983). Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors’ reason and lead them to convict the defendant without sufficient other evidence. Koon, supra, citing State v. Perry, 502 So.2d 543, 558-559 (La.1986).
Here, although the appellant alleges that the court erred by allowing the State to introduce cumulative photographs, at trial defense counsel objected to the introduction of only two photographs, S-15 and S-18. These photographs are close-up views of McGlothen, and both show the knife still in his eye and blood on his face. These photographs, while somewhat disturbing, depict the injuries suffered by McGlothen and do not appear to be so gruesome that they would have overwhelmed the jurors’ reason and would have led them to convict *867 the appellant based upon the photographs alone. As such, the trial court did not err by allowing the State to introduce these photographs. This assignment is without merit.
V.
By his final assignment, the appellant avers that the trial court imposed excessive sentences. The court imposed the maximum sentence for each offense, forty years at hard labor for manslaughter and fifty years at hard labor for attempted second degree murder, the sentences to run consecutively.[3] See La.Rev.Stat. 14:31; 14:27; 14:30.1.
In State v. Smith, 01-2574, pp. 6-7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
1 a Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to - excessive — punishment” (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
See also State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973; State v. Batiste, 06-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Landry, 03-1671 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235.
In Batiste, at p. 18, 947 So.2d at 820, this Court further explained:
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, supra; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resen-tencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Landos, 419 So.2d 475 (La.1982). The reviewing court shall l?,j.not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial *868 court imposed is too severe in light of the particular defendant as well as the circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State v. Landry, 2003-1671 at p. 8, 871 So.2d at 1239. See also State v. Bonicard, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
Here, both Archie Kaiser and McGlothen’s brother testified at the sentencing hearing about McGlothen and the effect his death has had on them. Defense counsel then argued that the appellant was taken from his family at the age of six and had been in treatment for mental problems for many years. Counsel also reminded the court that Jiminez, the victim of the attempted second degree murder, had indicated that he hoped the appellant could be evaluated for mental help. The court referred to the presentence investigation report, which is included in the appellate record. According to the report, the appellant had several arrests both as a juvenile and as an adult. He has juvenile adjudications for purse snatching and possession of ammunition by a minor, and adult convictions for simple robbery, battery of a correctional officer, and attempted simple escape. The court recounted the facts of both counts and then imposed the maximum sentences. The record shows that the court more than adequately complied with La.Code Crim. Proc. art. 894.1.
Contrary to the appellant’s assertions, it does not appear that the trial court erred by imposing maximum sentences on both counts. The appellant alleges that both victims were sexual predators who preyed on young, homeless, unsettled men. However, there is absolutely nothing in the record to support this allegation. | ¡>sThe evidence shows that each victim agreed to allow the appellant to stay at his residence temporarily. The appellant admitted at trial that he has family in the area; his cousin lived in the apartment complex where McGlothen was killed, and the appellant was arrested while hiding under a bed at his stepfather’s residence. The appellant also argues that the evidence against him was weak as to both counts, but as noted above the State presented sufficient evidence to support both convictions.
This Court has upheld forty-year sentences for manslaughter in the past. See State v. Allen, 06-1434 (La.App. 4 Cir. 3/7/07), 954 So.2d 779, writ denied 07-0944 (La.11/9/07), 967 So.2d 502 (the defendant, who had prior convictions, stabbed someone whom he thought had stolen his wallet); State v. Bell, 02-2349 (La.App. 4 Cir. 8/6/03), 854 So.2d 429 (the defendant, who had no prior convictions, stabbed her lover; she had been charged with second degree murder); State v. Jones, 01-0630 (La.App. 4 Cir. 3/20/02), 814 So.2d 623 (the defendant, charged with second degree murder, was convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604 (the defendant, charged with first degree murder, was convicted of manslaughter when he opened fire in the apartment of a man with whom he had previously fought). Given the circumstances of this case, including the nature of McGlothen’s wounds and the appellant’s criminal history, it does not appear that the trial court abused its discretion by imposing the maximum sentence for manslaughter, especially in light of the fact that the evidence would have supported a verdict of second degree murder.
| j>4The cases cited by the appellant do not show that the forty-year sentence is excessive in his case. In both State v. *869 Matthews, 532 So.2d 270 (La.App. 3 Cir. 1988), and State v. Taylor, 535 So.2d 1146 (La.App. 2 Cir.1988), the appellate courts found that sentences of twenty-one and eighteen years, respectively, were excessive. At the time of these offenses, the maximum sentence for manslaughter was twenty-one years. In both cases, the defendants had no prior convictions, and in Matthews the defendant pled guilty to manslaughter, while in Taylor, the evidence showed no animosity between the defendant and the victim, the defendant was nonviolent, and there was no indication that he intended to kill the victim when he went to the victim’s house. In State v. Brown, 35,641 (La.App. 2 Cir. 8/20/03), 852 So.2d 1234, the court found that a twenty-year sentence was not excessive for a manslaughter conviction, and in State v. Taylor, 35,921 (La.App. 2 Cir. 4/3/02), 813 So.2d 1151, the court found that a twenty-two year-sentence was not excessive. However, in none of these cases was the defendant also convicted of a similar crime occurring only a few weeks after the manslaughter involved in the case.
Likewise, the court did not err by imposing the fifty-year sentence on the attempted second degree murder sentence. Fifty-year sentences have been upheld by this and other courts in the past. See State v. Robicheaux, 03-1063 (La.App. 5 Cir. 12/30/03), 865 So.2d 149 (the defendant struggled and shot the victim during an attempted armed robbery; the court also upheld a forty-nine-and-a-half-year-sentence for attempted armed robbery); State v. Pyke, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713 (the defendant shot the victim in the back with no provocation; the defendant had a prior conviction); State v. Davis, 93-0663 (La.App. 4 Cir. 2/25/94), 633 So.2d 822 (the defendant convicted of two counts of | ^attempted second degree murder and one count of attempted armed robbery; the defendant shot at three people while trying to rob them); State v. Hill, 431 So.2d 871 (La.App. 2 Cir.1983) (the defendant, a mildly-retarded psychotic first-offender, lured a jailer close to his cell and slashed him with a razor).
The appellant argues that the court should not have imposed the maximum sentence on this count because the evidence was weak against him, given his explanation for the stabbing. However, as noted above, the jury apparently did not believe his testimony. The State presented strong evidence to support the conviction. Given the circumstances of the case, including the wounds inflicted on the victim without provocation and the appellant’s criminal history, as well as the fact that the appellant committed a very similar stabbing that resulted in a death only a few weeks prior to this stabbing, it does not appear that the trial court erred by imposing the maximum sentence for the attempted second degree murder conviction.
Accordingly, for the reasons set forth above, we affirm the appellant’s convictions and sentences.
AFFIRMED.

. The court ordered that the forty-year sentence for manslaughter was to be without benefit of probation or suspension of sentence. La.Rev.Stat. 14:31 prohibits probation or suspension of sentence for at least ten years only where the victim is killed as a result of a battery and was under ten years of age. The victim in this case was stabbed, and although his age was not given, it is apparent that he was over the age of ten. Nonetheless, because the court did not place the appellant on probation or suspend his sentence, this error is harmless.

. See State v. Demise, infra.

. The appellant does not argue that the consecutive nature of the sentences is excessive. See La.Code Crim. Proc. art. 883, which provides for consecutive sentences for convictions that do not arise out of the same act or transaction.